UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. 05-20476-CIV-JORDAN/KLEIN

HIDALGO CORP.,

       Plaintiff,

v.

J. KUGEL DESIGNS, INC., JULIE SABEN a/k/a
JULIE A. KUGEL a/k/a JULIE K.
MOSKOWITZ, and ROBERT SABIN a/k/a
ROBERTO SABATINO,

       Defendants.

_____/



### *SUA SPONTE* ORDER OF RECONSIDERATION AND AMENDED REPORT AND RECOMMENDATION THAT PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION BE GRANTED IN PART AND DENIED IN PART

The Court has reviewed the Objections of the Defendant to the Court's May 20. 2005 Report and Recommendation, and sua sponte issues the following Amended Report and Recommendation.

THIS MATTER came before the Court on Plaintiff's motion for Preliminary Injunction (D.E. 2,7). Hearings took place on April 6, 2005, April 8, 2005, and May 6. 2005. The Court took testimony, examined the documents and the jewelry in question, read the depositions, affidavits and declarations, considered the demeanor and credibility of the witnesses. and is otherwise fully advised. Based on the pleadings, evidence presented, and arguments of counsel. the undersigned Magistrate Judge reports and recommends that Plaintiff's motion for preliminary injunction should be GRANTED in part and DENIED in part, for the reasons set forth below.

## I. FINDINGS OF FACT

<u>THE PARTIES</u>

The Plaintiff, Hidalgo Corp., ("Hidalgo") is engaged in the business of manufacturing and distributing novel enamel rings of its original designs under federally registered copyrights. In addition. Hidalgo also is the owner of a federally registered trademark for some of its jewelry. In addition to the enamel rings which have various fanciful designs, Hidalgo promotes, advertises, and sells its enamel rings as part of a stackable three ring set, consisting of an enamel ring in the center, and two narrower diamond bands--one on each side of the enamel ring. Although the diamond bands are neither copyrighted nor trademarked, the stackable center enamel ring which is part of the three ring set is trademarked and the three ring set is heavily advertised. Hidalgo has spent over $10,000,000 advertising and promoting what it calls its signature three ring stackable sets, and has created advertising displays and brochures depicting the stackable sets in a unique way.

Hidalgo sells its jewelry through a system of authorized dealers. Dealerships are given only to high quality jewelry stores, with established credit ratings and with permanent physical store locations. A large number of rings sold by Hidalgo are custom orders, which may only be taken and transmitted to Hidalgo by an authorized dealer, and Hidalgo only provides jewelry pursuant to those custom orders to its authorized dealers.

Dealers are not prohibited from selling the center enamel rings separately, without the outer diamond bands. They may also sell the enamel ring with non-Hidalgo outer bands. They may also sell the Hidalgo outer diamond bands separately; however, they are prohibited from advertising or displaying the enamel ring with non-Hidalgo diamond bands in the three ring method promoted and

advertised by Hidalgo without clearly designating the fact that the three ring set is not a Hidalgo stackable set. If they sell the Hidalgo ring with non- Hidalgo bands, they cannot represent such a three ring grouping to be a Hidalgo set.

The Defendant, J. Kugel Designs, Inc., ("Kugel"), is a Florida corporation, owned and operated by the Defendants Robert Sabin and Julie Sabin. The Defendants sell jewelry to the public through traveling or transitory jewelry shows, but have no store or other fixed location for displaying and selling jewelry. At a typical show, they will have display cases and tables to exhibit the jewelry they are selling. They will usually have a table displaying Hidalgo jewelry, with a sign that says "Hidalgo." The font used on the "Hidalgo" sign is the same or substantially similar as that used by Hidalgo on its invoices. The Defendants also display three ring sets in a manner identical to Hidalgo's display of its stackable sets, except the outer diamond bands in the Defendants' displays are not Hidalgo rings. There is no signage or other information that would advise a customer that the outer rings are not Hidalgo rings. The Defendants also have Hidalgo brochures showing Hidalgo merchandise, which are placed in the center of the Hidalgo display case. The Defendants take custom orders for Hidalgo rings, which are transmitted to Hidalgo through an authorized Hidalgo dealer known as Casino Jewelry Inc. ("Casino"). Hidalgo was unaware that the Defendants were placing these custom orders through Casino. The Defendants are not authorized dealers of Hidalgo merchandise. One of the Defendants, Julie Sabin, a/k/a Julie Kugel, attempted to become an authorized dealer for Hidalgo, but she was turned down.

Casino Jewelry became an authorized dealer about four years ago, at a time when it had a store in the Sands Hotel in Atlantic City, New Jersey. Casino closed its store sometime thereafter, and its sole place of business after that was nothing more than a mail drop. It represented to Hidalgo

3

that its business office was relocated to 61 Central Square, Suite 102, Linwood, N.J., 08821. In reality, that address was Post Office Box 102 located at a UPS store. At about the same time that Casino became an authorized dealer, Robert Sabin acquired a 50% ownership interest in Casino, and operated the business. This fact was unknown to Hidalgo. When Sabin received custom orders for Hidalgo jewelry on behalf of Kugel, he would prepare a sales order from Kugel to Casino, and mail it to Casino's post office box. Then he would pick up the order from Casino's box, and place the order on behalf of Casino with Hidalgo as the representative of Casino, using the name "Richard." Hidalgo was unaware of the fact that "Richard" was in fact Robert Sabin. When Casino received the jewelry ordered by "Richard" from Hidalgo, it would be transferred to Kugel for delivery to the customer. Casino earned no money in these transactions.

Although Casino would invoice Kugel for the jewelry, no money ever changed hands between the two companies. Casino files no tax returns, pays no sales tax, has no taxable income, and provides no tax documents such as 1099's or W-2's to Kugel or anyone else. In short, it was merely a straw man for the Defendants to order jewelry after Hidalgo refused to give Defendants a dealership. There is nothing of record to show that Casino sold any Hidalgo merchandise to anyone other than the Defendants. When Hidalgo learned these facts at the initial hearing in this matter, and particularly that Casino had no physical location, Casino's dealership was immediately revoked.

Using the Hidalgo brochures and price lists, Mr. Sabin represented to customers that he could obtain any ring in the Hidalgo line. In addition to all of the foregoing, evidence was presented, which the court finds credible, that Mr. Sabin represented to customers and others that the Defendants were authorized Hidalgo dealers, when in fact, that was not so. In addition to displaying the three ring sets containing a mix of Hidalgo and non-Hidalgo rings in a manner similar to that

promoted and established by Hidalgo, the Defendants sold such mixed sets to customers without disclosing that some of the pieces were non-Hidalgo. Although Sabin denies doing so, in light of other testimony presented and other facts adduced, some of which are set forth above, the court does not find his testimony credible.

THE SEIZURE

In April 2004, after being shown a Hidalgo brochure, Corrine Lerman placed a special order with the Defendants at a jewelry show in Baltimore, Maryland for a set of three reputed stackable Hidalgo rings. She received the reputed Hidalgo set several months later, but the rings appeared to her to be inferior in color, quality, and design. When she complained to the Defendants, Julie Sabin told her that the rings had been bought on Ebay, and then changing her story, told Ms. Lerman the rings had been purchased from a jeweler who had bought them from Hidalgo. Lerman sent the rings to Hidalgo Corp., and Silvio Hidalgo, the owner of Hidalgo Corp., determined that the rings were not genuine Hidalgo rings, but were in fact, imitations. He signed a declaration to that effect, also stating that the imitation rings contained the Hidalgo stamp and Hidalgo copyright on the inside of the rings "which clearly infringe on the Hidalgo copyrights and trademarks." Hidalgo Declaration ¶6, December 2, 2004.

Based on the foregoing, the Plaintiff filed the instant suit, claiming trademark violations of Sections 32 and 43(a) of the Lanham Act, (15 U.S.C. 1114 and 1125(a)), and copyright violations of 17 U.S.C. §501 of the Copyright Act. The Plaintiff also applied for and received a temporary restraining order against Defendants, including a seizure order pursuant to 15 U.S.C. 1116(d). The seizure order was based on the belief, substantiated by declarations from Hidalgo and Lerman, that Defendants were offering counterfeit Hidalgo jewelry for sale, which were infringing on the

5

Plaintiff's trademark. Thereafter, a large quantity of jewelry, brochures, and related items were seized from the Defendants at a jewelry show in King of Prussia, Pennsylvania.

THE HEARINGS

A series of hearings was conducted before this Court. In addition to the facts found by this court in the FINDINGS OF FACT section above, this Court also finds as follows:

The Plaintiff seized and is in custody of 85 items of jewelry which have been separately tagged and marked. Of the 85 items, Plaintiff concedes, and the court finds, that all but 7 are genuine Hidalgo rings. Those items which are genuine Hidalgo should be returned to the Defendants for the reasons set forth below.

The other seven items, (Numbers 28, 66, 67, 71, 72, 73, 81) the origin of which are in dispute, should be retained under seizure, except for Items 72 and 81, which should be returned, for the reasons set forth below.

## II.  THE APPLICABLE LAW

The Copyright Act (17 U.S.C. §101 et seq.) protects the author of original works and designs including pictorial, graphic and sculptural works from infringement of such works. Section 502 provides for injunctions to prevent or restrain infringements of copyrights. Section 503 provides for impoundment of all unauthorized copies or reproductions of items which infringe upon a copyrighted work.

The Lanham Act 15 U.S.C. §1114 which affords trademark protection, provides:

(1)  Any person shall, without the consent of the registrant–
    (a)  use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or

advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering of sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action.

This section prohibits copying or reproducing a registered trademark of another. The protection afforded by this section is narrower than that afforded by 15 U.S.C. §1125 which prohibits false designation of origin and false descriptions. Ives Laboratories, Inc. v. Darby Drug Co. Inc., 601 F.2d 631, 636 (2d Cir. 1979).

However, Section 1114 is broad enough to cover instances in which a person sells genuine trademarked goods in a manner likely to cause the public to believe that person to be part of the trademark holder's authorized sales network. Stormor v. Johnson, 587 F. Supp. 275, 279 (W.D. Mich. 1984); See The Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477 (5th Cir. 2004). It also covers goods which are counterfeit, to the extent that there is an unauthorized use of an original trademark. Westinghouse Electric Corp. v. General Circuit Breaker and Elec. Supply Corp., 106 F.3d 894 (9th Cir. 1997); General Elec. Co. v. Speicher, 877 F.2d 531 (7th Cir. 1989); Burger King v. Mason, 710 F.2d 1480 (11th Cir. 1983); Taylor Made Golf Co. Inc. v. MJT Consulting Group, LLC, 265 F. Supp. 2d 732 (N.D. Tex. 2003).

Section 1125 of the Lanham Act prohibits false designations of origin, or misleading descriptions of fact likely to cause confusion as to the origin of goods. This section also covers false representations of claiming to be an authorized dealer of genuine trademarked goods. Yurman Design, Inc. V. Diamonds and Time. 169 F. Supp. 2d 181 (S.D. N.Y. 2001); Fetzer Co., 381 F.3d at

483. Section 1125 may also include false designations of origin if the product's appearance has acquired a secondary meaning that the purchasers are likely to confuse the imitating goods with the originals. Laureyssens v. Idea Group, Inc., 964 F.2d 131 (2d Cir. 1992); Omega, S.A.V. S&N Jewelry Inc., 1992 WL 142746 (S.D. N.Y. 1992).

Section 1116 of the Lanham Act provides for injunctive relief; it also provides for the seizure of goods in civil actions arising under 1114(1)(a) only with respect to violations that consist of the use of a counterfeit mark in connection with goods sold or offered for sale.

## III. STANDARDS FOR INJUNCTIVE RELIEF

A party seeking a preliminary injunction for trademark infringement must establish four elements: (1) substantial likelihood of success on the merits; (2) that it would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to the trademark owner outweigh whatever damage the injunction may cause to the alleged infringer; (4) that the injunction, if issued, would not be adverse to the public interest.

The same standards apply in copyright infringement cases. Palmer v. Braun, 287 F.3d 1325 (11th Cir. 2002).

## IV. APPLICATION OF LAW TO FACTS

There is no dispute that most of the items seized were genuine Hidalgo rings. The Plaintiff argues that seizure of these items should nevertheless be maintained because they represent violations of the Lanham Act. First, it maintains that they were sold or offered for sale by Defendants misrepresenting themselves as authorized dealers. Second, the Plaintiff contends that

8

many of the items (specifically 20 of them) were counterfeit as that term is defined pursuant 15 U.S.C. 1114. By falsely advertising and displaying these 20 items as genuine Hidalgo 3 ring stackable sets, the Plaintiff maintains that these items are counterfeit and subject to seizure under Section 1116(d). The Plaintiff's arguments will be dealt with in that order.

First, it bears emphasis that the resale of genuine trademarked goods generally does not constitute infringement. Davidoff & CIE, S.A. v. PLD International Corp., 263 F.3d 1297 (11th Cir. 2001); Matrix Essentials Inc. v. Emporium Drug Mart, Inc., 988 F.2d 587 (5th Cir. 1990). This concept is an expression of what has been called the "first sale" or "exhaustion" doctrine. This principle holds that the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of that product. Allison v. Vintage Sports Plaques, 136 F.3d 1443 (11th Cir. 1998); NEC Electronics v. CAL Circuit Abco, 810 F.2d 1506 (9th Cir. 1987 ("Once a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring any trademark liability") (Citing Prestonettes, Inc., v. Coty, 44 S.Ct. 350 (1924)).

Thus the Defendants, having acquired the Hidalgo trademarked rings after the first lawful sale to Casino, [1] they were free to resell the goods without violating the Plaintiff's trademark rights. That said, what the Defendants were not free to do was to represent themselves as authorized Hidalgo dealers when they offered and made sales of the merchandise. Based on the evidence presented and adverted to above, the Court finds that Defendants did in fact improperly represent themselves as authorized Hidalgo dealers and therefore violated the Lanham Act. Thus, the Plaintiff has satisfied the condition of likelihood of success on the merits.

---

[1] Although it could be argued that Casino had violated its dealership conditions and thus lost its authority, it was nevertheless an authorized dealer until its status was later revoked by the Plaintiff.

9

The next element the movant must establish to obtain a preliminary injunction is irreparable harm. This is easily satisfied here. In a trademark case, irreparable injury is established where there is any likelihood of confusion as to the source of the goods in question. Lobo Enterprises, Inc. v. Tunnel, Inc., 822 F.2d 331 (2d Cir. 1987). In this circuit, a sufficiently strong showing of likelihood of confusion caused by trademark infringement may by itself constitute a showing of substantial threat of irreparable harm. Davidoff, 263 F.3d at 1303; McDonald's Corp. v. Robertson, 147 F.3d 1301 (11th Cir. 1998). Representations that the seller of such goods is an authorized dealer when in fact he is not is ipso facto likely to cause confusion as to the source of such goods. When Plaintiff makes a prima facie showing of trademark infringement, irreparable injury is ordinarily presumed. McDonald's Corp., 147 F.3d at 1310. Thus, the Plaintiff has established irreparable harm.

The third element, which requires the balancing of potential harms, gives the court pause. The initial basis for the seizure, i.e., 15 U.S.C. 1116, is inapplicable to a seizure of genuine trademarked goods. Since Defendants legitimately possessed the Hidalgo items, and had a right to sell them, (absent a claim that they were authorized dealers) there appears to be no authority that would justify the seizure and continued retention of such goods. Despite the Defendants' clear violation of the Lanham Act in claiming to be authorized dealers, in the absence of statutory authority permitting seizure of legitimate goods, seizure and forfeiture of such goods appears to be unwarranted. Research reveals no cases in which seizure was regarded as the appropriate remedy for the type of Lanham Act violation involved here. In fact, all the cases which have considered the extant violation have provided for injunctive relief limited to requiring the violator to make and exhibit appropriate disclaimers of affiliation with the owner of the trademark. Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296 (5th Cir. 1997) (ordering return

to Defendant of authentic Herend pieces); <u>Yurman Design Inc. v. Diamonds and Time</u>, 169 F. Supp. 2d 181 (S.D. N.Y. 2001) (permitting Defendants to continue selling Plaintiff's trademarked products but requiring them to display disclaimer of affiliation with Plaintiff); <u>Apple Computer v. Micro Team</u>, 2000 WL 1897354 (N.D. Cal. 2000) (enjoining Defendant from advertising that it was an authorized Apple brand product or reseller); <u>Stormor v. Johnson</u>, 587 F. Supp. 275 (W.D. Mich. 1984) (enjoining Defendants from advertising affiliation with Plaintiff, and requiring them to display signage to that effect).

Next, the Plaintiff maintains that seizure was proper under 15 U.S.C. 1116(d) because 20 items are "counterfeit" under 15 U.S.C. 1114. Since they were improperly advertised and displayed as a three ring Hidalgo set in violation of the Plaintiff's trademark, it argues, they may be designated as counterfeit. It relies on <u>Taylor Made Golf Co. V. MJT Consulting Group, LLC</u>. 265 F.2d 732 ( N.D. Tex. 2003) for this proposition. In that case, the Defendants assembled golf clubs consisting of genuine Taylor Made heads and shafts made by others. The clubs were represented to be "Taylor Made." None of the Defendants was an authorized dealer of Taylor Made. After Taylor Made filed suit for trademark infringement, one of its representatives explained that "Taylor Made does not sell golf heads and golf club shafts as separate components. To the contrary, Taylor Made only places into the stream of commerce complete golf clubs with the shafts and club heads fully assembled by Taylor Made professionals."

In finding the clubs assembled by Defendants to be counterfeit, the court stated at 741:

> [3] It is undisputed that the marks on the club heads were generated by Plaintiff. They are not, in any literal sense, fake or counterfeit marks. However, "unauthorized use of an original trademark can qualify as counterfeiting." [FN63] In cases involving the reconditioning of genuine trademarked goods with nongenuine parts, the courts have been willing to find the original trademark on

the reconditioned product "to be 'counterfeit' within the meaning of [15 U.S.C.] §§1116(d) and 1127 ....," [FN64] although adequate disclosure of the alterations is usually sufficient to prevent confusion. [FN65] At least one court has found infringement where the defendant used *genuine* parts to rebuild the mark holder's machines. [FN66] Courts have also found that trademarked goods "[are] not truly 'genuine' unless [they were] manufactured and distributed under quality controls established by the [trademark owner]." [FN 67]

The facts in Taylor Made are a far cry from what is involved here. Golf club heads and shafts cannot be used independently and must be physically joined and glued to produce a usable product. Taylor Made did not sell the components separately, and only sold complete golf clubs consisting of all Taylor Made parts.

In the case at bar, Hidalgo sold the components separately, and in fact sold a large quantity of the middle enamel rings without the outer diamond bands to Casino and to others. The rings are capable of being worn separately and not as part of a three ring set. The rings are not physically joined to one another. They are simply "stacked," one on top of another. Hidalgo does not prohibit its dealers from selling the rings separately, nor from mixing the middle Hidalgo enamel ring with non-Hidalgo outer bands. They are only prohibited from representing that such a mixed set which they sell is a genuine Hidalgo stackable three ring set.

Based on the foregoing distinctions, Taylor Made is inapposite. While Defendants' conduct in displaying mixed sets as genuine Hidalgo stackable three ring sets may be a violation of Plaintiff's dealership policies, and possible Lanham Act violations, those issues should await final hearing. But for now there is simply no evidence that such improprieties rise to the level of counterfeit goods as that term is defined pursuant to 15 U.S.C. Section 1114. Accordingly, those 20 items, consisting of genuine Hidalgo enamel rings and outer diamond bands made by others, (the latter being neither in violation of Hidalgo's copyrights nor its trademark) should also be returned to the Defendants.

The final element is that the injunction would not be adverse to the public interest. There is nothing to indicate that an injunction here would adversely affect the public interest. Enjoining illegal infringement activity and preventing consumer confusion in the marketplace serves the public interests. _Davidoff_, 263 F.3d at 1304.

### SCOPE OF THE INJUNCTION AS TO RETURNED JEWELRY

Despite the fact that most of the jewelry should be returned to Defendants, they have violated the Lanham Act and therefore do not escape scot-free from appropriate injunctive relief. Whether they may be liable for damages is for another day. But for now, in any future displays of Hidalgo jewelry, the Defendants must clearly show that they have no affiliation with Hidalgo. They must prominently display a sign at least equal in size and font to the Hidalgo signs which reads: "The Seller is not an authorized dealer of Hidalgo Jewelry and is not affiliated with Hidalgo Jewelry in any way." They must also cease and desist from advertising and showing three ring stackable sets which contain less than all Hidalgo pieces. If any Hidalgo ring is shown as part of such a three ring stackable set, all pieces must be Hidalgo. If they sell a three ring stackable set which contains a Hidalgo ring combined with non-Hidalgo rings. they must so advise the consumer. and also so indicate on the sales slip which is given to the consumer. They must retain a copy of such sales slips to allow for possible future monitoring.

### THE COPYRIGHT VIOLATIONS

Seven items are claimed to be in violation of Hidalgo's copyrights. The Plaintiff presented testimony and other evidence which the Court deems credible and sufficient that the items are not genuine Hidalgo. Although several of the Plaintiff's witnesses expressed caution in the form of a few lingering doubts about the possible genuineness of several of them, there is sufficient evidence

13

at this juncture to preliminarily enjoin return of these items, and if either party so moves, to allow further analysis during merits discovery. [2] In determining the issue of likelihood of success on the merits, the court may also consider whether there are sufficiently serious questions on the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor. Genesee Brewing Co., Inc., v. Stroh Brewing Co., 124 F.3d 137 (2d Cir. 1997); Yurman, 169 F.Supp.2d at 185. The court always retains the continuing supervisory power to modify the terms of an injunction. U.S. v. Swift, 52 S.Ct. 460 (1932).

At this juncture, the Plaintiff has made a sufficient showing of likelihood of success on the merits, based on the foregoing considerations, to warrant continued retention of five of the seven items in question. Returning them to Defendants might well prevent the Plaintiff from ever showing they are not genuine Hidalgo items. The balance of hardships thus tips in favor of continued seizure until the merits of this case are decided.

The Plaintiff has also established the other elements required for a preliminary injunction for the same reasons stated earlier in connection with the violations of the Lanham Act, which are equally applicable to these violations of the Copyright Act.

The Court has examined the seven items, and is of the opinion that items 72 and 81 should also be returned. Item 72 consists of eight outer diamond bands. Since Hidalgo's copyrights and trademark do not extend to any of its diamond bands, these eight rings cannot be copies of any protected items. Likewise, item 81 is a diamond band and does not appear to be a copy of a

---

[2] Although the initial seizure was pursuant to 15 U.S.C. 1116, this Court has the authority to continue the seizure pursuant to the All Writs Act, 28 U.S.C. § 1651. Issuing the preliminary injunction with reference to items which are in violation of the Copyright Act aids the court in the exercise of its injunctive powers granted under the Copyright Act.

14

protected item. They should both be returned to the Defendants. The other five items. Numbers 28, 66,67,71, and 73 should be retained since they appear to be copies of genuine Hidalgo rings, and there is sufficient evidence at this juncture that they are not.

### REPRESENTATIVE SAMPLE

Finally, it is the Court's recommendation that the Plaintiff be permitted to retain up to seven representative pieces seized by it to use for comparison and display purposes for the jury at the trial of this cause. Such retention is for evidentiary purposes only, and not intended as a form of permanent relief.

## V. CONCLUSION

Based on the reasons stated above, the undersigned hereby **RECOMMENDS** that Plaintiff's Motion for Preliminary Injunction should be **GRANTED in part** and **DENIED in part** as provided above.

DONE AND ORDERED in Chambers at Miami, Florida, this _9_ day of June, 2005.

THEODORE KLEIN
UNITED STATES MAGISTRATE JUDGE

Cc:    District Judge Jordan
       All Counsel of Record

The parties shall have ten days after being served with a copy of this Amended Report and Recommendation to file written objections, if any, for consideration by the District Judge. Failure to file objections timely shall bar the parties from attacking any factual findings contained herein.