UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO: 05-20476-CIV-JORDAN/KLEIN

HIDALGO CORP.,

    Plaintiff,

v.

J. KUGEL DESIGNS, INC.,
JULIE SABIN a/k/a JULIE A.
KUGEL a/k/a JULIE K.
MOSKOWITZ, and ROBERT SABIN,

    Defendants.
_____/

**NIGHT BOX FILED**

MAY 0 3 2006

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## PLAINTIFF'S RESPONSE OPPOSING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Hidalgo Corp. ("Hidalgo"), hereby responds to Defendants' Motion for Summary Judgment on the three counts of the Amended Complaint as follows:

### OVERVIEW

At issue is (1) whether Defendants have violated the Lanham Act by utilizing the Plaintiff's trademarks in commerce without the Plaintiff's permission; (2) whether the Defendants infringed upon Plaintiff's copyright; and (3) the personal liability of Robert Sabin and Julie Kugel as the controlling persons of J. Kugel Designs, Inc. ("J. Kugel"). Plaintiff, likewise has moved for Summary Judgment[1] and this Court should determine that Plaintiff, and not the Defendants, is entitled to Summary Judgment on Plaintiff's Lanham Act claims.

This Court has already heard these issues and ruled in favor of Plaintiff on its Motion for Temporary Injunction, making the specific and detailed findings that the Defendants violated the

---

[1] The Plaintiff adopts the positions taken and support cited in its own Verified Motion for Summary Judgment and requests the Court to view these two Motions together.

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

Lanham Act and determining that the Defendants only affirmative defense (the first sale doctrine) is not applicable. For the same reasons that the Court has already ruled in favor of the Plaintiff on its Motion for Temporary Injunction, the Court should likewise rule in favor of the Plaintiff on its Motion for Summary Judgment and likewise deny Defendants' Motion for Summary Judgment.

I. **RESPONSE TO DEFENDANTS VERSION OF THE FACTS.**

Defendants omitted a few key facts, which are not in controversy, as follows:

1. When Casino closed its retail operation at the Sands Hotel, it continued to induce Hidalgo to believe that it maintained its retail operation at the Sands Hotel and that it had only moved its administrative office. (See Sabin Deposition of December 12, 2005, Page 59, Line 9).

2. Defendants' administrative office was nothing more than a UPS post office box from which Casino arranged for jewelry that was shipped to Casino to be subsequently drop shipped to J. Kugel. (See Sabin Deposition of April 13, 2005, Page 4, Lines 8-16).

3. The reason why Hidalgo never asked Casino to provide a credit application was because Casino asked to be a cash-only customer, without credit. (See Sabin Deposition of December 12, 2005, Page 106, Line 1).

4. Although Hidalgo did not have a written contract with its customers, it did send out from time to time letters and statements advising its authorized retailers of its policies. These policies must be adhered to by authorized Hidalgo retailers or Hidalgo would terminate the retailer as an authorized representative. (See Declaration of Silvio Hidalgo dated December 2, 2004).

5. In their Motion, the Defendants present Casino as a legitimate business operation. However, the documentary evidence presented in this case demonstrates, as this Court has

2

already determined, that Casino was nothing more than a front or strawman for J. Kugel. First, Casino had no accounting records other than a check registrar which shows that it only bought jewelry from Hidalgo which it only sold to J. Kugel. (See Sabin Deposition of February 8, 2006, Page 274, Lines 20-25). This evidence was collaborated by Mr. Sabin who could not name a single customer to whom Casino sold goods to other than J. Kugel. (See Sabin Deposition of December 12, 2005, Page 183, Lines 8-10). Finally, Casino filed no tax returns until the discovery period in this case was closed. (See Supplement to Expert Witness Report of William G. Urban, II, CPA, attached hereto).

6.  When Casino sent purchase orders to Hidalgo, it used dummy purchase orders that were not sequentially numbered. (See Sabin Deposition of December 12, 2005, Page 183, Lines 22-25).

7.  Often, Casino's purchase orders to Hidalgo were signed by someone using Robert Sabin's alias name. (See Sabin Deposition of December 12, 2005, Page 181, Lines 8-22).

8.  J. Kugel maintained no concurrent accounting records but rather only created accounting records after the close of the discovery period in this case. (See Supplement to Expert Witness Report of William G. Urban, II, CPA, attached hereto).

9.  J. Kugel and Casino filed no timely tax returns, only filing tax returns for 2002, 2003 and 2004, after the close of discovery period in this case. (See Supplement to Expert Witness Report of William G. Urban, II, CPA, attached hereto).

Defendants also assert certain facts which are untrue, and otherwise immaterial to the issues raised in Defendants' Motion for Summary Judgment. However, Plaintiff wishes the Court to have an accurate version of the facts.

3

Defendants state they advised their customers that the diamond bands were not Hidalgo and that they never represented themselves as authorized Hidalgo representatives. Sabin's self-serving uncorroborated statements defy logic and Sabin has proven wholly credible as this Court has already found. Most importantly, the unrebutted documentary evidence contradicts Sabin's version of the facts, which show:

1.  Casino had no vendors other than Hidalgo. (See Sabin Deposition of February 8, 2006, Page 277, Lines 4-12 and Page 278, Lines 1-4).

2.  Casino had no customers other than J. Kugel. (See Sabin Deposition of February 8, 2006, Page 278, Lines 5-16 and Page 269, Lines 14-17).

3.  J. Kugel did not indicate on its invoices that the diamond bands were anything other than Hidalgo. (See Supplement to Expert Witness Report of William G. Urban, II, CPA, attached hereto).

4.  J. Kugel arranged its display case to induce the public to believe the sets (diamond bands and inner enamel rings) that were displayed together were all genuine Hidalgo goods. (See Sabin Deposition of April 13, 2005, Page 169, Lines 13-28 and Page 170, Lines 5-8).

5.  David Labowitz testified that Sabin represented to him all the jewelry was genuine Hidalgo. (See David Labowitz's testimony at Preliminary Hearing on May 6, 2005, Page 5, Lines 14-20).

## II. DEFENDANTS' CLEAR VIOLATIONS OF THE LANHAM ACT.

As demonstrated in Plaintiff's Motion for Summary Judgment, Defendants have violated the Lanham Act in three regards: (1) they utilized the Plaintiff's mark "Hidalgo" in commerce, without permission of the trademark owner; (2) by their overt acts and intentional omissions,

4

they induced the public to believe that they were associated with, or endorsed by, Hidalgo when in fact they were not; and (3) they have sold generic, non-genuine diamond bands, inducing the public to believe that such diamond bands were genuine Hidalgo goods.

This Court has heard extensive evidence on how Defendants engaged in fraudulent, deceptive trade practices in order to obtain genuine Hidalgo goods. Defendants then sold genuine Hidalgo goods in combination with non-genuine matching bands, inducing the public to believe the entire set was genuine. As this Court has already determined, Defendants set up Casino as a "front" for J. Kugel as Casino was not a legitimate business,[2] thus, they do not fall into the narrow protections of the first sale doctrine. Included in such improper actions are:

1. Defendant Robert Sabin's use of an alias name in order to hide his identity from Hidalgo.

2. Defendants' submission to Hidalgo of forged purchase orders on behalf of Casino.

3. Defendants' use of unknown persons to forge Sabin's "alias name" on checks that were sent to Hidalgo.

4. Defendants' payment for goods with checks that were returned for non-sufficient funds.

Most importantly, the Defendants undertook all of these actions during the time that Hidalgo was already suing the Defendants in the State Court case (Miami-Dade County Circuit Court, Case No: 03-20885 CA (08)) to stop these very actions.

The Lanham Act protects legitimate business enterprises such as Hidalgo, who create goodwill, from predatory scavengers like Defendants, who seek to capitalize on that good will

---

[2] See Report and Recommendations dated May 20, 2005 and Order of this Court dated September 19, 2005 adopting same.

5

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

for their own benefit. The Lanham Act grants the trademark owner with the legal power to determine who and under what circumstances third parties can use that Mark. See <u>Park N' Fly v. Dollar Park N' Fly</u>, 469 U.S. 189 (U.S. 1985).

Defendants misstate that the Plaintiff's Mark is the name "Hidalgo" written in a particular font together with a Don Quixote figure. The Plaintiff's registered trademark proves otherwise. (See Exhibit A to Plaintiff's Complaint). Plaintiff owns the Mark "Hidalgo," written in no particular font for all purposes in connection with the sale of jewelry. Defendants do not deny that they attempted to trade upon the Hidalgo Mark by selling Hidalgo jewelry without the permission of the Plaintiff, nor do not deny that Hidalgo: (a) grants exclusive territories to its authorized representatives; (b) only allows legitimate retail operations to become authorized Hidalgo representatives; and (c) only allows "high-end" jewelry stores to be authorized Hidalgo representatives. Defendants do not contest that through their "gypsy" operations, they have damaged the legitimate reputation and business plan of Hidalgo in that: (a) Defendants have no retail store, and therefore its customers have no one to turn to with complaints other than to Hidalgo; (b) Hidalgo's perceived association with a low-end, traveling operation like J. Kugel only cheapens the value of the Hidalgo brand; (c) Defendants violated the exclusive territorial area granted by Hidalgo to its legitimate authorized Hidalgo retailers; and (d) manufacturers like Hidalgo must enhance its public business reputation and status as a high-end brand through its association with high-end reputable retailers.

### III.   THE FIRST SALE OR EXHAUSTION DOCTRINE DOES NOT APPLY TO THESE DEFENDANTS.

Defendants stake their entire defense upon the applicability of the first sale or exhaustion doctrine. The Defendants erroneously assert that the first sale doctrine is the general rule, when

6

rather, it is a limited exception to the general rule. The general rule is that a trademark holder, like Hidalgo, has the legal right and power to control the quality of goods manufactured and services given under the holder's trademark. See <u>Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.</u>, 267 F. Supp. 2d 1268 (S.D. Fla. 2003) and <u>Babbit Electronics v. Dynascan</u>, 828 F. Supp. 944 (S.D. Fla. 1993).

Defendants have erroneously cited to the holding in <u>Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.</u>, 988 F.2d 587 (5th Cir. 1993) and <u>Iberia Foods Corp. v. Romeo</u>, 150 F.3d 298 (3rd Cir, 1998). These cases follow the holding of <u>Stormor v. Howard Johnson</u>, 587 F. Supp. 275 (W.D. Mich. 1984), for the proposition that the first sale doctrine is a limited defense, applicable only if the infringer falls within the narrow requirements of <u>Stormor</u>. Thus, the first sale doctrine only applies where: (1) the defendant sells genuine trademark goods which it had acquired from a legitimate source; (2) which it then resells without undertaking any advertising; (3) it does nothing more than stock, display and resell a producers product without altering the product; and (4) it acts properly, without any culpable conduct on the part of the infringer. See <u>Matrix</u>, <u>Stormor</u> and <u>Sebastian Int'l v. Longs Drugs Stores Corp.</u>, 53 F.3d 1073 (9th Cir. 1995). For any one of the six reasons below, Defendants do not fall within the limited safe harbor of the first sale doctrine.

1. **<u>The Sale By The Infringer Does Not Follow A Legitimate First Sale.</u>**

The infringer (J. Kugel) is not a reseller and there is no prior legitimate first sale by the trademark holder (Hidalgo) to an authorized representative (Casino) as required under the first sale doctrine. See <u>Sebastian</u> at 1076. Defendants admit in their Motion that most of their orders of Hidalgo goods are "custom orders," i.e., where the sale by the infringer occurs first and <u>then</u>

7

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

the Defendants used Casino as a front to <u>subsequently</u> obtain the goods from Hidalgo. Thus, the alleged legitimate sale (Hidalgo to Casino) is the second sale and not the first sale.

2.     **<u>The First Sale (From Hidalgo To Casino) Was Not A Legitimate Sale.</u>** As this Court has already determined, the sales from Hidalgo to Casino were not legitimate, but rather were tainted with fraud as Casino was merely set up as a front or strawman to obtain goods on behalf of the infringer. The intent of Casino's acts described herein was clearly designed to induce Hidalgo to believe that Casino was a legitimate retail operation; purchasing the goods for sale at its "store" at the Sands Hotel and Casino which did not exist after April 2002. When asked in his deposition, Sabin could not identify: (a) a single customer to whom Casino sold goods to other than J. Kugel; nor (b) a single supplier of goods to Casino other than Hidalgo. (See Robert Sabin Deposition of February 8, 2006, Page 278, Lines 1-13). Even Casino's check register (the only business records kept by Casino) indicate only transactions with J. Kugel. (See Robert Sabin Deposition of February 8, 2006, Page 278, Lines 11-23). Casino has no records of any legitimate activities, such as bank, tax and accounting records, other than records created after the close of the discovery period in this case.

3.     **<u>J. Kugel Held Itself As Associated With Or Endorsed By Hidalgo In Violation Of The First Sale Doctrine.</u>**

<u>Sebastian</u> holds the first sale doctrine does not apply if the infringer takes actions to induce the public to believe they are associated with or endorsed by the trademark owner. See also <u>Bandag, Inc. v. Al Bolser's Tires Store, Inc.</u>, 750 F.2d 903 (Fed. Cir 1984), where the Court found that the first sale doctrine <u>did</u> <u>not</u> apply where the defendant used the plaintiff's logo in "in store advertisements," which falsely lead the consumer to conclude that the defendant was one of the plaintiff's authorized representatives. In <u>Bandag</u>, like the Defendants allege here, there was

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

no evidence that the infringer made actual use of the plaintiff's mark other than in an in store advertisement, nor was there any evidence that the infringer actually represented himself as an authorized franchisee of the trademark holder. Like in Bandag, the Defendants have subtly induced the public to believe they were an authorized Hidalgo representative. Defendants admit they used the sales brochures and the official price list created by Hidalgo in order to solicit and accept "custom" orders; which only authorized Hidalgo representatives can solicit. Hidalgo is not required to demonstrate any express representations made by J. Kugel regarding such an association or affiliation.[3] Rather, the burden to show legitimacy is on Defendants. See J.B. Williams Co. v. Le Conte Cosmetics, Inc., 523 F.2d 187, 193 (9th Cir. 1975), cert. denied, 424 U.S. 913 (U.S. 1976) and Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215 (9th Cir. 1987). By taking custom orders of genuine Hidalgo goods from its catalog (for subsequent manufacturers), Defendants clearly proffered an association with Hidalgo.

Defendants seek refuge by displaying a disclaimer behind the display case that said "To maintain our low prices we are a non-authorized dealer of name brand designer jewelry." This is of little consequence and cannot, in any event, be reconciled with the Defendants' prominent use of the Hidalgo Mark, the official Hidalgo sales materials including Hidalgo's brochures and selling price (in a display case of Hidalgo), and the solicitation by Defendants of "custom" orders.

**4.     The First Sale Doctrine Does Not Apply Where The Reseller Sells Trademarked Goods That Are Materially Different From Those Sold By The Trademark Owner.**

---

[3] Sabin testified at the injunction hearing that he never held himself as an authorized Hidalgo representative and the Court determined his testimony was not credible on this point. See Report and Recommendation dated May 20, 2005.

9

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

A material difference is one that consumers consider relevant to a decision on whether to purchase a product. See <u>Davidoff & Cie, S.A. v. PLD International, Corp.</u>, 263 F.3d 1297 (11th Cir. 2001). Here, the Defendants sold inferior, generic, cheap and non-genuine diamond outer bands in conjunction with genuine Hidalgo enamel inner bands, inducing the consumer to believe the outer bands were genuine Hidalgo and part of a matching set.

Sabin admitted that not a single J. Kugel invoice describes these bands as anything other than genuine Hidalgo goods but yet he claims (without collaboration) that he never misrepresented the bands' source. (See Sabin Deposition of February 8, 2006, Page 288, Line 11 and Page 289, Line 6). This situation is analogous to the facts in <u>Bandag</u>, where the defendant used the plaintiff's trademark in a fashion that suggested he used the Bandag process to recap tires, where the defendants sold both Bandag recapped tires as well as tires he recapped himself and he did not use the Bandag method for his own recapping activities. The Court found that by such acts the public was lead to the conclusion he was authorized by the trademark owner even though he denied making such overt statements. Likewise, identical goods sold in an unauthorized manner are not genuine for purposes of the Lanham Act. See <u>Babbit Electronics</u> at 1180 (a defendant can by silence, induce the public to believe he is associated with the trademark holder).

### 5. <u>Kugel Exceeded The Scope Of Allowable Activities Under The First Sale Doctrine By Advertising And By Accepting Custom Orders Rather Than Merely Selling From Stock.</u>

Defendants acknowledge they made at least three advertisements using the Plaintiff's Mark which were displayed within a homogeneous display case of genuine Hidalgo jewelry. The message of those advertisements cannot be viewed in a vacuum, but must be viewed together with the Hidalgo sales materials that Defendants used (which is only provided to

10

authorized representatives). Custom orders cannot, by definition, satisfy the narrow and specific requirements of the first sale doctrine because goods are not sold from stock but rather ordered for future delivery. Sabin could not document a single sale by J. Kugel of Hidalgo merchandise from stock. (See Robert Sabin Deposition of February 8, 2006, Page 316, Line 12). The first sale doctrine only allows a defendant to sell from stock without advertising. See Stormor at 279 and Sebastian at 1076. Defendants' "in store" advertisements clearly leave customers with the impression that Defendants carry the entire Hidalgo line and that they can take custom orders. Custom orders by definition are not sales "from stock."

### 6. The Defendants Have Engaged In Improper Activities Outside The Scope Of Protection In The Safe Harbor.

The first sale doctrine does not apply where an infringer engages in acts of bad faith or acts in a manner which could harm the trademark holder. These Defendants have engaged in numerous intentional acts of bad faith and should not be entitled to the privilege of protection under the first sale doctrine.

In assessing the likelihood of confusion under the Lanham Act, the Court must consider the eight factors first annunciated in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2nd Cir. 1961). Since the Defendants admit they have used the exact Hidalgo mark, the two most relevant factors relevant to this case are: (1) the Defendants lack of good faith; and (2) the quality of Defendants' product as compared to the Plaintiff's product. Under the good faith factor, the Court must look at whether the Defendants utilized the Mark with the intention of capitalizing on Plaintiff's reputation in goodwill and thus created confusion as to whether the Plaintiff has endorsed the Defendants' actions. See Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955 (2nd Cir. 1996). After being denied direct authorization from Hidalgo, and in

11

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

spite of the State Court case to stop them, the Defendants created a scheme to establish Casino as a front and used Hidalgo's brochures and sales materials which are only given to authorized representatives. Such acts, by definition, exhibit bad faith.

The factor of the quality of Defendants product likewise falls in favor of a finding of Plaintiff. This factor is primarily concerned with whether Hidalgo's reputation could be jeopardized by Plaintiff's actions. See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867 (2nd Cir. 1986).

Hidalgo's reputation is harmed by its mere association with J. Kugel and their "gypsy" operation. It is undisputed in this case that at least five (5) of J. Kugel's customers who complained about the quality of the service that J. Kugel had rendered brought those complaints directly to Hidalgo. The reason for this is self-evident. Casino does not have a physical store and thus can not provide follow-up customer service after a sale. Further, the Defendants harmed Hidalgo by selling its customers cheap, generic diamond outer bands, rather than genuine Hidalgo diamond bands. J. Kugel's tactics were clearly designed to induce their customers to believe that these bands were in fact genuine Hidalgo bands, so Defendants could sell these bands at Hidalgo prices." The undisputed facts reveal the Defendants' true intentions. None of J. Kugel's invoices which it gave to its customers indicated or informed their customers that the diamond bands were not genuine Hidalgo bands.

Defendants attempt to create an issue as to whether the diamonds were inferior to Hidalgo's diamond bands. However, that issue is irrelevant for the Court need not make a determination of quality, merely because the diamond bands were not genuine Hidalgo bands (a finding of inferior quality of non genuine goods is not a prerequisite to a finding of

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

infringement).  See <u>Babbit Electronics, Inc. v. Dynascan Corporation</u>, 38 F.3d 1161, 1180 (11th Cir. 1994) and <u>Four Season</u> at 1329.

Section 114 of the Lanham Act extends protection against the use of a plaintiff's mark on any product or service which could reasonably be thought by the purchasing public to come from the same source or thought to be associated with, connected to, or sponsored by the trademark owner.  See <u>Counsel of Better Bus. Bureaus, Inc. v. Bailey & Associates</u>, 197 F. Supp. 2d 1197 (E.D. Mo. 2002).  Defendants' argument misses the point as to the overriding intent of the Lanham Act to provide protections to a <u>trademark owner</u> who has spent time, effort and energy to create a business reputation and, as such, has the right to determine who and in what matter it licenses the right to a third party to utilize and exploit its registered trademark.  See 15 U.S.C. §1114, note 3, 15 U.S.C. §1125, note 4, and <u>Park 'N Fly v. Dollar Park and Fly</u>, 469 U.S. 189 (U.S. 1985) (a reseller has created the likelihood of confusion by leading consumers to believe they are authorized distributors of a trademark product even when they are not passing off an inferior product as a trademark owner's product simply because they are trying to capitalize on business by using the plaintiff's trademark).  Also see, <u>Champions Golf Club v. Champions Golf Club</u>, 78 F.3d 1111 (6th Cir. 1996).

IV.     **DEFENDANT CLEARLY COMMITTED COPYRIGHT INFRINGEMENT**

Defendants assert the Corinne Lerman heart ring is genuine and therefore, they have not engaged in copyright infringement.  Defendants' argument misses the mark.  It is undisputed that the Corinne Lerman heart ring is an original design of Hidalgo's which Hidalgo had copyrighted with the U.S. Copyright office on Form VA.[4]  17 U.S.C. §501(a) states that anyone who violates any of the exclusive rights of the copyright owner as provided . . . is an infringer of the

---

[4] See Exhibit B attached to Plaintiff's Complaint.

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116

copyright. One of those exclusive rights is the right of the copyright owner to distribute copies. See Hotaling v. The Church of Jesus Christ of Latter Day Saint, 118 F.3d 199 (4th Cir. 1997). Therefore, whether or not the ring is genuine, it is still a copyrighted design of Plaintiff and Defendants had no right to distribute it. Therefore, Defendants have violated Plaintiff's copyright.

## V. PERSONAL LIABILITY OF ROBERT SABIN AND JULIE KUGEL.

Defendants have presented no reason why Robert Sabin and Julie Kugel (the owners and directors and only employees of Defendant, J. Kugel) are not personally liable for the infringing acts of J. Kugel as the controlling persons. Robert Sabin admitted he was the president and 50% owner of J. Kugel. He used the alias name "Richard Lewis", and "Richard Lewis" placed all the purchase orders with Hidalgo and signed its checks. The tax returns finally filed by Defendants exhibit that Robert's wife, Julie Sabin, is also the president of J. Kugel. Each of the J. Kugel's invoices to its customers evidencing infringing sales of Hidalgo goods are signed by either Robert Sabin or Julie Kugel. At no time did Robert Sabin disclose the name of any other employee of J. Kugel. (See Robert Sabin Deposition of December 12, 2005, Page 9, Lines 15-16).

It is undisputed that the persons who control the infringing actions of a corporation are personally liable for Lanham Act claims and copyright infringement claims. Defendants have proffered no evidence that they did not control the activities of J. Kugel and thus are not personally liable for these claims. Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F.Supp. 1035 (N.J. 1990).

## CONCLUSION

14

Based on the foregoing, Defendants' Motion for Summary Judgment on the three counts of the Amended Complaint should be denied.

### CERTIFICATE OF SERVICE

I certify that a copy hereof was mailed to Nina Stillman Mandel, Esq., Mandel & Mandel LLP, 169 E. Flagler Street, Suite 1200, Miami, Florida 33131, on May 4, 2006[5].

                WOLFE & GOLDSTEIN, P.A.
                Counsel for Plaintiff, Hidalgo Corp.
                100 S.E. Second Street, Suite 3300
                Miami, Florida 33131
                Telephone:   (305) 381-7115
                Facsimile:    (305) 381-7116

                By: _____
                     RICHARD C. WOLFE
                     Fla. Bar No: 355607

H:\Hidalgo Corp\v. Kugel, et al\pldgs\response to defendants mt for sj.doc

---

[5] Plaintiff's counsel believes this Response was filed on April 27, 2006, however we do not see it docketed so we are re-filing our Response as of this date.

15

WOLFE & GOLDSTEIN, P.A. • 100 S.E. Second Street, Suite 3300 • Miami, Florida 33131
Telephone: (305) 381-7115 • Facsimile: (305) 381-7116



United States District Court

Southern District of Florida

Case No. 05-20476-CIV-Jordon

Hidalgo Corp.

V.

J. Kugel Designs, Inc.
Julie Sabin a/k/a Julie Kugel a/k/a
Julie K. Moskowitz and Robert Sabin

Supplement to

Expert witness report of
William G. Urban II

February 23, 2006



I.  **Introduction**

(See original report dated February 23, 2006)

II. **Assignment - Supplement**

I was retained by the law firm of Wolfe & Goldstein, P.A. Subsequent to my report of February 23, 2006, I was asked to review the expert report of Michael Anthony DeCarlo, Jr., The DeCarlo Group, LLC.

III. **Expert Opinions – Supplement**

In my expert opinion, the records used by Michael Anthony DeCarlo, Jr. in preparing his expert report are inherently unreliable for the following reasons:

1) The June 30, 2002, 2003, 2004 and 2005 federal income tax returns of Kugel were all prepared in March 2006 from recreated records, well after their due dates and, were obviously created merely for this litigation. For the same reasons the underlying accountancy records are unreliable, these returns are unreliable.
2) Invoices and purchase orders relied upon have no sequential numbering system to insure that all are accounted for. The casino purchase orders merely had "dummy numbers." Robert Sabin admitted many purchase orders were forged. Therefore, these source records are inherently unreliable.
3) The information relied upon was put together using the "cash basis" of accounting which by definition leads to distortion of the true economics of transactions.
4) The schedule of total payments by Casino to Hidalgo did not take into account that many of these payments from Casino to Hidalgo were not honored by Casino's bank.
5) The records relied upon by Mr. DeCarlo were not provided to the plaintiff until after the last deposition of Robert Sabin, as they were created for purposes of this litigation and the records conflict with Mr. Sabin's testimony.
6) To date, there has yet to be provided any documents indicating sales by Casino to anyone other than Kugel.
7) When records are recreated after the fact, from source documents that are not reliable, especially due to the lack of sequentially numbered purchase and sales orders (which is a standard accounting control), especially in a cash business like the retail jewelry business, there can be no reliability on such records.



My expert opinion is also that the only conclusion made by Mr. DeCarlo that is reliable, is his computation of Kugel's gross profit percentage on the sale of Hidalgo merchandise. From the information he was provided, Mr. DeCarlo computed an average gross profit percentage of 39%, while my sample of the information provided resulted in a gross profit percentage of 41%.

## IV. Work Performed - Supplement

In addition to the work detailed in my report of February 23, 2006, I read the expert opinion of Michael Anthony DeCarlo, Jr., The DeCarlo Group, LLC. I also analyzed the June 30, 2002, 2003, 2004 and 2005 Federal Income Tax Returns of Kugel as well general ledgers of Kugel and invoices used by Mr. DeCarlo in determining his expert opinion.

## V. Bases for Opinions - Supplement

Based upon my reading of the expert opinion of Michael Anthony DeCarlo, Jr., The DeCarlo Group, LLC and the underlying information which he relied upon, I determined the information to be unreliable. Accordingly, I determined his conclusions, other than his computation of Kugel's gross profit percentage from sales of Hidalgo merchandise, to be unreliable.

## VI. Expert Qualifications - Supplement

I am a Principal with McClain & Company LC, a public accounting firm, where I am the Principal in charge of the audit and attest practice. I am a Certified Public Accountant, licensed to practice in Florida. I have devoted the past twenty-eight years of my professional life to the audit and analysis of financial statements and related financial data. A copy of my current Curriculum Vitae (including my education, current and past employment, professional affiliations, publications written and, prior expert testimony was attached to my original report dated February 23, 2006.

My firm has billed approximately $7,500.00 to date for this engagement. Fees and expenses incurred to date and not yet billed are approximately $1,000.00. Therefore, total fees and expenses incurred on this project to date are approximately $8,500.00. Additional fees and expenses may be billed between now and trial if additional work is requested by counsel. My compensation is not contingent on the outcome of this litigation.

The only work contemplated, but not yet completed, is the preparation to testify and attendance at depositions and trial.

William G. Urban II
April 3, 2006