**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 05-20476-CIV-JORDAN/TORRES

HIDALGO CORP.,

      Plaintiff,

vs.

J. KUGEL DESIGNS, INC., JULIE SABEN
a/k/a JULIE A. KUGEL a/k/a JULIE K.
MOSKOWITZ, and ROBERT SABIN a/k/a
ROBERTO SABATINO,

      Defendants.

_____/

**REPORT AND RECOMMENDATION**
**ON MOTIONS FOR SUMMARY JUDGMENT**
**RELATING TO TRADEMARK AND COPYRIGHT CLAIMS**

      This matter comes before the Court on Plaintiff's Verified Motion for Summary
Judgment [D.E. 132] and Defendants' Motion for Summary Judgment [D.E. 137], with
respect to Plaintiff's pending trademark and copyright claims.   Following an Order of
Reference entered by the Honorable Adalberto Jordan on July 14, 2006, and after a delay
occasioned by a change in Defendants' counsel, the Court held a hearing on the pending
motions on October 19, 2006.  After considering the arguments of counsel and reviewing
the entire record, the undersigned recommends that Plaintiff's Verified Motion for
Summary Judgment be denied and that Defendants' Motion for Summary Judgment be
granted in part and denied in part, for the reasons set forth below.

**I.   BACKGROUND**

      Plaintiff is a manufacturer of jewelry, which it sells under its registered trademark
"Hidalgo."  Plaintiff is well known for enamel and diamond jewelry, particularly stackable

rings, which are sold in sets of 3 or 5 rings.  Except for an occasional, one-time only, "courtesy sale" of an individual piece, Plaintiff only sells jewelry to its network of authorized representatives who must satisfy specific criteria that Plaintiff requires them to maintain.

J. Kugel ("J. Kugel") is a Florida corporation owned and controlled by Robert Sabin ("Sabin") and Julie Kugel ("Kugel") (collectively "Defendants"), which sells its merchandise at traveling jewelry shows.  At these shows, Defendants set up a display booth where it sells jewelry from portable display cases.  Defendants attempted to obtain authorization from Plaintiff to sell its merchandise.  There is no dispute that Plaintiff rejected that application and that, during all relevant time periods, Defendants never became an authorized dealer.

In 2001, a representative of Casino Jewelry at The Sands Hotel ("Casino") (now known to be Julie Kugel) called Plaintiff, requesting to become an authorized dealer of Hidalgo jewelry.  Sabin owns fifty percent of Casino, a fact that was unknown to Plaintiff.  At the time, Casino represented that it had a retail operation at The Sands Hotel and Casino in Atlantic City.  Casino was approved as an authorized dealer of the jewelry without entering into any written or oral limitation agreement with Plaintiff.

Casino did not market its Hidalgo jewelry to third party customers.  Casino would forward the merchandise to Defendants in order for Defendants to sell the genuine Hidalgo rings at J. Kugel trade shows displays.

In April 2002, Casino closed its retail operation at The Sands Hotel.  Casino advised Plaintiff that it had moved its administrative office to 61 Central Square, Suite

2

102, Linwood, New Jersey 08821.  This address was not an actual storefront operation; it was a UPS post office mailbox.  After closing its retail operation, Casino continued to send purchase orders to Plaintiff on letterhead; it read: "Casino Jewelry at The Sands Hotel and Casino."  The goods purchased from Plaintiff were still intended for the benefit of Defendants' customers.  Casino does not maintain a general ledger or an accounts payable ledger and it does not file tax returns.  Casino has no records showing that it bought jewelry from any company other than Hidalgo or that it sold jewelry to anybody other than Defendants.  Additionally, it did not make a known profit on the sales to, or establish payment terms with, Defendants.  Defendants have no bona fide accounting records of their transactions with Casino.

From 2001 to 2005, Defendants attended many jewelry shows where they sold Hidalgo merchandise.  Typically, Defendants would display the merchandise by itself in a display case.  On the curtain behind the display case, Defendants hung a ten foot by four foot sign with the company's name.  On the bottom left corner of the sign, there is a disclaimer that reads: "To maintain our low prices we are a non-authorized dealer of name brand designer jewelry."  Within the display case there would be a plastic sign created by Defendants that read "Hidalgo", the official Hidalgo sales brochure, and a handwritten sign that either read "Entire line discount 40%-50%" or "40%-50% discount from retail."  Defendants would also display and present to customers the official Hidalgo sales literature and the official Hidalgo price list, which would indicate the price that Hidalgo would charge its authorized dealers and the suggested retail price.  The sales

3

literature and price list were only provided by Plaintiff to its authorized Hidalgo representatives.

Additionally, Defendants would solicit and accept from its retail customers custom orders of Hidalgo merchandise. Rings in sizes other than a 6 ½ would have to be manufactured by Plaintiff after the sale. When Defendants accepted a custom order, a purchase order was then sent to Casino. Casino would fax a purchase order on its letterhead to Plaintiff describing the merchandise that Defendants had already sold. Plaintiff would then send the merchandise to Casino, which would later forward the merchandise to Defendants for delivery to the customer. Stephanie Patterson, Jo Locke, Joy Collins, Elizabeth Newman and Corinne Lerman are all J. Kugel customers who bought custom Hidalgo rings.

In 2003, Plaintiff learned that Defendants were selling Hidalgo jewelry at these jewelry shows. It filed an action in state court at about that time seeking to enjoin J. Kugel from representing itself as an authorized dealer. That lawsuit was never prosecuted to a conclusion and was, instead, dismissed without prejudice.

Two years later, in 2005, Plaintiff filed the pending federal action, raising trademark infringement, false designation of origin, and copyright infringement claims. Plaintiff initially obtained an ex parte temporary restraining order that authorized the seizure of counterfeit "Hidalgo" jewelry that Defendants were believed to be selling. [D.E. 8]. Subsequently, a preliminary injunction hearing was held, after which a preliminary injunction was entered based on Magistrate Judge Klein's finding that Defendants were improperly representing themselves as authorized Hidalgo dealers when they offered and

made sales of the jewelry and, therefore, violated the Lanham Act, 15 U .S.C. §§ 1114 and 1125(a). [D.E. 61].

Judge Klein found, however, that only five of the items seized were counterfeit Hidalgo rings.  The remaining items seized pursuant to the temporary restraining order were thus ordered returned to Defendants because "the defendants legitimately possessed the Hidalgo items and had a right to sell them (although not the right to claim they were authorized Hidalgo dealers).  Because § 1116 does not apply to seizure of genuine trademarked goods, seizure of the genuine trademarked Hidalgo jewelry from the defendants was therefore improper." [D.E. 61 at 2].

Plaintiff's pending motion for summary judgment suggested that Plaintiff continued to maintain that Defendants had sold counterfeit Hidalgo jewelry.  By the time of the October 19th hearing, however, Plaintiff expressly abandoned any claims that the Hidalgo jewelry in Defendants' possession is counterfeit.  Instead, Plaintiff argues that, while Defendants possessed genuine Hidalgo jewelry, it was a violation of Plaintiff's trademark for Defendants to sell that jewelry after obtaining it through a sham authorized dealer – Casino – through false pretenses.  It was also a violation of the trademark for J. Kugel to pose as an authorized Hidalgo dealer at its trade shows and in its displays, when in fact no one affiliated with J. Kugel was ever authorized to sell genuine Hidalgo jewelry.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Imaging Bus. Mach., LLC. v. BancTec, Inc.*, 459 F.3d 1186,

1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)).  In deciding a summary judgment

motion, the court must view all the evidence and make all reasonable inferences in the

light most favorable to the nonmoving party. *Id.* (citing *Cruz v. Public Super Mkts., Inc.*, 428

F.3d 1379, 1382 (11th Cir. 2005).  A material fact is one that might affect the outcome

of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where the

non-moving party fails to prove an essential element of its case for which it has the

burden of proof at trial, summary judgment is warranted.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225

(11th Cir. 1999).  Thus, the task is to determine whether, considering the evidence in the

light most favorable to the plaintiff, there is evidence on which the trier of fact could

reasonably find a verdict in their favor. *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d

at 1225.

### III.   ANALYSIS

**A.**     **_Plaintiff's Verified Motion for Summary Judgment_**

Plaintiff   seeks summary judgment on the first two counts of the Amended

Complaint, which will be addressed in order, and on the issue of the individual

Defendants' personal liability.

#### 1.   _Count I - Trademark Infringement_

Plaintiff's amended complaint alleges that J. Kugel and its controlling persons,

Sabin and Kugel, are liable for trademark infringement "based on the Defendants'

promotion, advertisement and commercial sale of both genuine Hidalgo and non-Hidalgo

jewelry using the Hidalgo Mark." [D.E. 19 ¶39].  Specifically, Plaintiff pleads that "[d]espite the inferior nature of the jewelry sold by the Defendant and the knowledge of the Defendant that they are without authority to represent they are an authorized Hidalgo representative, *and without authority to use the Hidalgo Mark and Hidalgo's copyrights*, the Defendants have promoted, advertised and sold substantial [quantities] of both genuine Hidalgo jewelry as well as non-Hidalgo outer diamond bands, with the knowledge that such jewelry will be mistaken for the genuine high quality jewelry offered for sale by an authorized retailer and as a genuine Hidalgo set." [*Id.* ¶28 (emphasis added)].

### a. *Infringement Based on Resale of Genuine Hidalgo Jewelry*

The pending motion for summary judgment is first based in great part on the emphasized allegation above in the trademark claim that focuses on J. Kugel's sale of genuine Hidalgo jewelry.  Plaintiff argues that the consuming public is likely to be confused as to "the origin, sponsorship or approval of Hidalgo of J. Kugel's sale of Hidalgo goods" and "that Hidalgo condones the sale of its jewelry through low end traveling shows, as opposed to sales only by high end authorized representatives with established retail stores." [D.E. 132 at 8].

Specifically, Plaintiff points to Magistrate Judge Klein's finding in his Report and Recommendation on the motion for preliminary injunction that J. Kugel used Casino as a "straw man" to obtain genuine Hidalgo jewelry and then, without Hidalgo's consent (and indeed in the face of Hidalgo's decision *not* to accept J.Kugel as an authorized representative) sell that jewelry in traveling trade shows to the consuming public. [D.E. 43 at 9].  Plaintiff concludes that, because there is no genuine issue of fact that Casino

was indeed utilized as a front for J. Kugel, even genuine Hidalgo jewelry sold by J. Kugel was per se unlawful and a violation of Hidalgo's trademark.

In their opposition to the motion, Defendants rely principally on two arguments. First, Defendants argue that Judge Klein's amended Report and Recommendation, which was adopted by the District Judge in entering the preliminary injunction [D.E. 61], expressly found that no trademark infringement could be found merely on the use of the alleged straw man Casino entity to purchase legitimate Hidalgo goods. Defendants believe that this conclusion must be drawn now in opposition to the summary judgment, and indeed in support of their cross-motion on the same issue. Second, Defendants argue that at best there are issues of fact as to whether their receipt of Hidalgo goods from Casino satisfies the first sale or exhaustion doctrine under trademark law to foreclose Plaintiff's from any relief under Count I.

Plaintiff counters that the "first sale" or exhaustion doctrine does not bar Defendants' trademark liability for reselling Hidalgo rings because it is undisputed that Casino was a sham corporation. There was, therefore, no "legitimate" sale that occurred between Hidalgo and Casino. The first sale in these transactions took place when Defendants sold their wares using Hidalgo jewelry obtained through unauthorized means. As a result, the first sale doctrine is completely inapplicable. And, if so, Plaintiff posits that Defendants must be liable for trademark infringement for illegitimately obtaining, without Plaintiff's authorization, Hidalgo jewelry and then reselling it in a manner that would confuse the public.

The first sale doctrine protects resellers of genuine trademarked goods from claims of infringement. *Davidoff & CIE, S.A. v. PLD Int'l. Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001). This doctrine is premised on the theory that consumers are not confused as to the origin of goods that are resold. *Id.* The Lanham Act only seeks to "prevent the deceptive use of trademarks to confuse consumers, thereby protecting consumer goodwill toward the trademark owner's business and the ability of consumers to make informed choices among competing products." *McDonald's Corp. v. Shop At Home, Inc.*, 82 F. Supp. 2d 801, 807 (M.D. Tenn. 2000). Under the first sale doctrine, the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of the product. *Davidoff & CIE, S.A.*, 263 F.3d at 1301.

Consequently, to trigger the protections afforded by the first sale doctrine, there must be an original sales transaction, after which a resale transaction can occur outside the auspices of the trademark infringement statute, section 1115. For Plaintiff to be correct, the transfer of the rings from Hidalgo to Casino must not constitute a "sale." Plaintiff does not argue, however, that there was no sale between Hidalgo and Casino, but rather injects a requirement into trademark law that the first sale be "legitimate." By "legitimate" the Plaintiff means that the first sale may not be tainted by any fraud, deception or misrepresentation. Notably, however, Plaintiff does not cite any case law to support this particular definition of the first sale doctrine. The Court has undertaken a thorough search for case law supporting this proposition and has found none, outside of this case.[1]

---

[1]    The cases that Plaintiff does rely upon simply do not stand for the proposition that the first sale doctrine does not exist where an "illegitimate" first sale is

The law of this case, contrary to Plaintiff's suggestion, points to the contrary. Judge Klein expressly found that the first sale doctrine applied in this case, even though he considered Casino to be a straw man manipulated by Defendants.  That is why he ordered the return of most of the Hidalgo merchandise that Plaintiff had originally seized in the case.  As Judge Jordan's Order summarized that finding, "[s]pecifically, Magistrate Judge Klein determined that the defendants legitimately possessed the Hidalgo items and had a right to sell them (although not the right to claim they were authorized Hidalgo dealers).  Because § 1116 does not apply to seizure of genuine trademarked goods, seizure of the genuine trademarked Hidalgo jewelry from the defendants was therefore improper. *See* June 9, 2005, Amended Report and Recommendation at 9." [D.E. 61 at 2 n.2].

Apart from the law of this case that has previously upheld the viability of the first sale doctrine to these facts, a general overview of the purpose of trademark law persuasively shows why Plaintiff's argument on this point must fail.  Trademark law protects consumers, not trademark owners, from fraud.  For example, a trademark

> (a) designates the source or origin of a particular product or service, even though the source is to the consumer anonymous; (b) denotes a particular standard of quality which is embodied in the product or service; (c) identifies a product or service and distinguishes it from the products or services of others; (d) symbolizes the good will of its owner and motivates consumers to purchase the trademarked product or service; (e) represents a substantial advertising investment and is treated as a species of property; or (f) protects the public from confusion and deception, insures that consumers are able to purchase the products and services they want, and enables the court to fashion a standard of acceptable business conduct.

1 Jerome Gilson, *Trademark Protection and Practice* 1-21 (2006).  The majority of these functions protect consumers from being deceived as to the quality of the good purchased.

---

alleged.  *See, e.g., Stormor v. Johnson,* 587 F. Supp. 275 (W.D. Mo. 1984).

The above-listed functions also protect trademark owners' ability to capitalize on their goods, but does not protect them from being deceived by those who they choose to sell their product. Other sources of law, such as contract or tort law, provide that protection.[2]

As the Plaintiff remarked at the hearing on the motions, most trademark infringement cases assume that the first sale between the trademark owner and the authorized dealer is legitimate or devoid of fraud. The absence of case law dealing with questionable first sales in the context of trademark law shows that any disputes relating to the "legitimacy" of first sales are likely left to other areas of law for resolution, and not trademark law. *See, e.g., NEC Electonics v. CAL Circuit Abco,* 810 F.2d 1506, 1509 (9th Cir. 1987) (sale of genuine trademarked product by seller unauthorized to sell not a violation of Lanham Act); *H.L. Hayden Co. v. Siemens Med. Sys.,* 879 F.2d 1005, 1023 (2d Cir. 1989) (same); *Matrix Essentials v. Emporium Drug Mart,* 988 F.2d 587, 593 (5th Cir. 1993) (same).

Having said that, we note that one case was found where the plaintiff similarly alleged that a first sale, for trademark purposes, was illegitimate. In *McDonald's Corp. v. Shop At Home, Inc.*, 82 F. Supp. 2d at 808, McDonald's Teenie Beanie Babies were being sold by the Shop At Home television network. Shop At Home obtained the toys from a third party who in turn bought the toys from McDonald's franchisees under

---

[2]     The Eleventh Circuit in *Davidoff* clearly explained how trademark owners are protected by the statute, none of which are directly addressed by the issue at hand here:  "A trademark owner has spent time, energy and money in presenting a product to the public and building a reputation for that product. . . . The Act prevents another vendor from acquiring a product *that has a different set of characteristics* and passing it off as the trademark owner's product. . . . This would potentially confuse consumers about the quality and nature of the trademarked product and erode consumer goodwill." *Davidoff,* 263 F.3d at 1301.

circumstances that violated the franchise agreement.  McDonald's sued Shop At Home and the third party, alleging trademark infringement.  Like the Plaintiff in this case, McDonald's asserted that the first sale doctrine was inapplicable because the first sale was illegitimate.  *Id.* at 811.  The court, however, rejected that contention.  Among other things, the court found that there were "no material facts in dispute that would negate the defendants' 'first sale' defense." *Id.*  The court explained further:  "It does not matter that the owner of the trademark objects to the use of its mark, as long as one *approved* sale has already occurred." *Id.* (citing  Restatement (Third) of Unfair Competition § 24) (emphasis added).

Although in *McDonald's* there were no allegations of fraud or misrepresentation that purportedly tainted McDonald's initial decision to make someone an authorized dealer, it still informs this Court's decision.  The court in *McDonald's* properly focused its analysis of the allegedly illegitimate first sale on its effect on consumers.  *Id.* at 812-13.  The court reviewed other cases where the applicability of the first sale doctrine had been examined and concluded that all the cases where the first sale doctrine applied involved instances where the trademarked goods had not been altered by the alleged infringer.  *Id.*

Further analytical support for Judge Klein's position, that cuts against Plaintiff's motion here, can be found in the Supreme Court's treatment of the first sale doctrine in the related context of copyright law.  *See Quality King Distrib., Inc. v. L'Anza Research Int'l, Inc.,* 523 U.S. 135 (1998).  In contrast to the trademark statutes, copyright law has codified the first sale doctrine in 17 U.S.C. § 109(a) ("the owner of a particular copy . . . lawfully made under this tile, or any person authorized by such owner, is entitled, without

the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy. . . .").  The Supreme Court was applying this statute in *Quality King* in a case that involved alleged copyright infringement by a distributor of hair care products.  That domestic distributor had obtained the plaintiff's copyrighted products from a foreign source, who had in turn obtained them from a foreign entity that was an authorized distributor of plaintiff's goods.  The plaintiff manufacturer was irked by the resale of its original goods in the United States contrary to its domestic marketing system, that only utilized certain high-end distributors.  This plaintiff argued that the integrity of its marketing system was being damaged by the unauthorized resale of its goods in the United States through low-end retailers, in violation of its copyright rights.  *Id.* at 138-140.

Importantly, there was no dispute in *Quality King* that the goods being resold were unauthorized copies; to the contrary, they were clearly genuine copies of the manufactured goods that had been purchased.  As a result, notwithstanding the statutory arguments raised by the copyright holder, the Court ultimately upheld the application of the first sale doctrine in that context based upon the "critical distinction between statutory rights and contract rights."  *Id.* at 143.  Specifically, the Court explained:

> In this case [plaintiff] relies on the terms of its contracts with its domestic distributors to limit their sales to authorized retail outlets. . . . [B]ecause those domestic distributors are owners of the products that they purchased from [plaintiff] (the labels of which were 'lawfully made under this title'), [plaintiff] does not, and could not, claim that the statute would enable [it] to treat unauthorized resales by its domestic distributors as an infringement of its exclusive right to distribute copies of its labels.

*Id.* at 143 (citations omitted).

13

Finally, in response to the argument that contractual rights were inadequate to protect the plaintiff from the improper importation of its goods, the Court rejected that argument under the relevant copyright statutes, specifically section 602(a). The Court found that copyright law's adoption of the "broad scope" of the first sale doctrine precluded that argument. "The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Id.* at 152.

Here, the thrust of Plaintiff's argument is that the related trademark infringement statutes must be applied to remedy Casino's/Defendants' false representations to Plaintiff in obtaining its authorization to purchase Hidalgo jewelry. That "sham" first sale was tainted by the fraud, which bastardized the resulting sale of the jewelry from Plaintiff to Casino. In turn, this makes the sale/transfer from Casino to Defendants illegitimate as well, injuring Plaintiff's ability to control its distribution network that it has taken much care to control.

For the same reasons that the Court in *Quality King* rejected a similar argument under the copyright statute's first sale doctrine, this Court must also reject this argument. There is no dispute that a sale (as that term is understood under the first sale doctrine) in fact occurred here; Plaintiff sold the jewelry and shipped it to Casino, which made a payment to Plaintiff. Plaintiff received the benefit of its bargain under its sale contract with Casino. Plaintiff thus placed the goods "in the stream of commerce." That is all that the first sale doctrine requires. *E.g., Sebastian Int'l Inc. v. Longs Drug Stores Corp.,* 53 F.3d 1073, 1076 (9th Cir. 1995) ("first sale" doctrine precludes application of

14

Lanham Act for resell of genuine goods "lawfully acquired on the open market under the true . . . trademark"); *Softman Prods. Co. LLC v. Adobe Sys., Inc.,* 171 F. Supp. 2d 1075, 1085-86 (C.D. Cal. 2001) ("The transfer of a product for consideration with a transfer of title and risk of loss generally constitutes a sale.").

Under these circumstances, Casino is free to sell it to a third party consumer, or third party distributors like Defendants. Plaintiff was, of course, contractually entitled to limit Casino's ability to do so (which it apparently did not do). Plaintiff could also sue Casino for injuries that it has suffered from Casino's alleged misrepresentations (which it has also not done). Ultimately, Plaintiff obtained one type of remedy from its contractual decision to stop selling goods to Casino. But trademark law, once that first sale occurs, can no longer step in to remedy the prior "illegitimate" sales, any more than copyright law could remedy the injuries cited in *Quality King.*

In other words, Casino's tortious conduct or contractual breach with Plaintiff does not give rise to a trademark remedy simply because Plaintiff can argue, like the manufacturer in *Quality King,* that its exclusive rights to distribute its products in the manner it sees fit is being trampled upon by "illegitimate" sales. Plaintiff has no authority for that proposition and the Court should not adopt it here.

Significantly, as in *Quality King* or *McDonald's,* there is no factual contention that the Defendants did anything to physically alter the Hidalgo rings in its possession, and no longer any argument that any of Defendants' "Hidalgo" jewelry were unlawful copies. Thus, despite Plaintiff's understandable dissatisfaction with the representations made by Casino to become an authorized dealer of Hidalgo jewelry, trademark law simply does not

15

provide a remedy for that conduct, even if it amounts to fraud, in this context.  The Defendants, therefore, did not commit trademark infringement by merely reselling the Hidalgo rings they obtained through Casino.  As a result, summary judgment cannot be entered on Plaintiff's first theory for trademark infringement.

### b.    *Inferred Association with Trademark Owner*

Plaintiff also argues that Defendants committed trademark infringement by falsely leading consumers to believe that it was associated with Plaintiff or served as an authorized dealer of Hidalgo jewelry.  The first sale doctrine clearly does not apply when a reseller of genuine goods does something more than simply reselling the goods.  *E.g.,* *Stormor,* 587 F. Supp. at 279 (notwithstanding first sale doctrine, reseller who displayed trademark in booth at trade show and in trade journal ads and stamped reseller's name on the producer's promotional literature infringed producer's trademark); *Bandag, Inc. v. Al Bolser's Tire Stores,* 750 F.2d 903, 911-16 (Fed. Cir. 1984) (reseller used trademark in phone directory ads that suggested reseller was authorized franchisee).

In Judge Klein's Amended Report and Recommendation [D.E. 43] that was adopted in the Order granting the preliminary injunction, the Court noted that Plaintiffs were likely to succeed on this portion of the infringement claim based on the evidence presented at the injunction hearing.  For example, there is evidence that Defendants would use Hidalgo brochures and price lists to represent to customers that they could obtain any ring in the Hidalgo line.  Additionally, Defendants would usually display a sign that reads "Hidalgo" at a table displaying Hidalgo jewelry.  Judge Klein noted that the font on the "Hidalgo" sign is the same or substantially similar as that used by Hidalgo on its

invoices.  Furthermore, Defendants also display three ring sets in a manner that is identical to Hidalgo's display of its stackable sets.  They also have Hidalgo brochures showing Hidalgo merchandise, which are placed in the center of the Hidalgo display case.  This evidence was found to be sufficient to give rise to a trademark infringement claim notwithstanding the first sale doctrine.

In its motion, Plaintiff also alleges that Defendants used signs reading "Hidalgo" and "40%-50% Off Entire Line", which Plaintiff argues could be interpreted to mean that Defendants are authorized dealers as they carry the entire Hidalgo line.  Defendants counter, however, with evidence that they habitually hang a ten foot by four foot poster that reads on the bottom left corner: "to maintain our low prices we are a non-authorized dealer of name brand jewelry."

Given the evidence presented by both the Plaintiff and the Defendants, in particular the Defendants' disclaimer, the Court finds that this claim presents genuine issues of material fact.  While Judge Klein found that the facts pointed in Plaintiff's favor, his finding was premised on the ultimate chances of success at trial.  Judge Klein was clearly relying on the testimony that he heard at the injunction hearing, from which he drew certain credibility findings against Defendants.  This clearly shows that the present motion should not be resolved by the Court on summary judgment, but rather should be presented to the trier of fact at trial.  *See also Holmes Group, Inc. v. RPS Prod., Inc.,* 424 F. Supp. 2d 271, 294 (D. Mass. 2006) (finding summary judgment inappropriate in infringement claim where a disclaimer is involved).

Plaintiff's motion suggests that the facts are undisputed.  Many of them are; but many critical ones are indeed disputed.  The method and manner by which Defendants sold the Hidalgo jewelry are clearly in dispute.  And because the Court must here draw all inferences from the evidence against Plaintiff, one can see how the evidence in the light most favorable to Defendants could show that the disclaimer they used adequately cured any possible suggestion of association between Defendants and Plaintiff, and dispelled any possible likelihood of consumer confusion.  Summary judgment, under the circumstances, cannot be granted.

### 2. *Count II - False Designation of Origin*

Section 43 of the Lanham Act prohibits false designation of origin and misleading descriptions of fact likely to cause confusion as to the origin of goods.  This section also covers false claims that one is an authorized dealer of genuine trademarked goods. *Montgomery v. Noga*, 168 F.3d 1282, 1300 (11th Cir. 1999); *The Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 483 (5th Cir. 2004); *Yurman Design, Inc. v. Diamonds and Time*, 169 F.Supp.2d 181 (S.D.N.Y. 2001).  To succeed on this claim, Plaintiff must prove that there was a likelihood of confusion on the consumers' part.  *Montgomery*, 168 F.3d at 1300; *The Scott Fetzer Co.*, 381 F.3d at 483; *Yurman Design, Inc.*, 169 F.Supp. 2d at 185.  A likelihood of confusion means that confusion is probable, rather than merely possible.  *The Scott Fetzer Co.*, 381 F.3d at 483.  The following factors are usually considered by courts in this circuit to determine likelihood of confusion: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6)

defendant's intent; and (7) actual confusion. *Lipsher v. LRP Publications, Inc.*, 266 F.3d 1305, 1313 (11th Cir. 2001) (citing *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999)). These are the same factors relevant to establishing a likelihood of confusion with respect to trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114. *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503-04 (11th Cir. 1985).

For some of the same reasons cited earlier, Plaintiff moved for summary judgment on Count II of the Amended Complaint that alleges that Defendants' conduct falsely designated the origin of Plaintiff's trademarked goods. But, based on the evidence and reasons also cited above, the Court finds that this claim presents genuine issues of material fact. Viewing the evidence in the light most favorable to Defendants, it is possible that their disclaimer was effective in mitigating the likelihood of consumer confusion as to Defendants' relationship to the Plaintiff. This issue should not be resolved by the Court on summary judgment, but rather should be presented to the trier of fact at trial. The Court further notes that if Plaintiff does not succeed on its trademark infringement claim on the basis that Defendants' customers were misled into thinking that J. Kugel was an authorized dealer of Hidalgo rings, it will necessarily fail on its false designation of origin claim based on these same facts. *Ross Bicycles, Inc.*, 765 F.2d at 1504.

### 3. *Personal Liability of Individual Defendants*

Plaintiff contends that Sabin and Kugel are personally liable for the actions of J. Kugel. That is true. The Eleventh Circuit addressed this issue in *Southern Bell Tel. & Tel.*

*v. Associated Tel. Directory Publishers*, 765 F.2d 801, 811 (11th Cir. 1985), holding: "An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement." Such an individual may be held liable even if ignorant of the infringement. *Id.* Since that decision, the Court has issued two other opinions reaffirming that holding. *See Chanel, Inc. v. Italian Activewear of Fla.*, 931 F.2d 1472, 1477 (11th Cir. 1991) ("If an individual actively and knowingly caused the infringement, he is personally liable."); *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) (". . . a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil."). And, individual defendants may be found liable for both copyright and trademark infringement. *See Southern Bell Tel. & Tel.,* 765 F.2d at 811; *Chanel, Inc. v. Italian Activewear of Fla.*, 931 F.2d at 1477.

Sabin and Kugel's liability here, however, depends on the outcome of the underlying claims. As the Court has already denied Plaintiff's summary judgment motion, the issue of Sabin and Kugel's liability must also be decided by the trier of fact, or at the very least following a trial and pursuant to Rule 50. Accordingly, summary judgment under Rule 56 should be denied on the issue of Sabin and Kugel's liability.

### B.   _Defendants' Motion for Summary Judgment_

Defendants' own motion for summary judgment alleges that judgment should be entered in their favor on all three counts of the Amended Complaint.  The Court will address each count in order, keeping in mind what it has already stated above as to Counts I and II.

### 1.   _Count I - Trademark Infringement_

First, Defendants argue that the resale of genuine Hidalgo jewelry does not violate trademark law based on the first sale doctrine.  Plaintiff argues that the first sale doctrine is inapplicable in this case given that Defendants obtained the Hidalgo jewelry through Casino, Casino was merely a front operation for the Defendant, and Casino employed fraudulent means to become an authorized dealer of Hidalgo jewelry.  Plaintiff's argument on this point fails for the reasons already addressed above.  The first sale doctrine applies to these facts, precluding Defendants' liability for trademark infringement for the resale of genuine trademarked goods.  "Therefore, even though a subsequent sale is without a trademark owner's consent, the resale of a genuine good does not violate the [Lanham] Act."  _Davidoff,_ 263 F.3d at 1302.

Nevertheless, the fact that Defendants are correct on this point of law that governs one part of Plaintiff's trademark infringement claim still does not warrant a summary judgment order in their favor based upon the other issues raised by the trademark claims.  Specifically, we have found that issues of fact remain as to whether Defendants improperly suggested an association between them and Hidalgo through their marketing

21

of Hidalgo jewelry, and whether they represented to consumers that they were authorized Hidalgo dealers, when in fact they were not.

Defendants contend that they did not deceive the public regarding their relationship to Plaintiff.  Defendants note that no evidence has been presented to prove that they told customers that J. Kugel was an authorized dealer of Hidalgo jewelry. Defendants point to one of the affidavits submitted by the Plaintiff, which states that J. Kugel informed the affiant that it purchased Hidalgo rings from a jeweler who "in turn bought the rings from Hidalgo." [D.E. 142, Aff. Corinne Lerman ¶ 9.]   Moreover, Defendants note that they prominently displayed a sign that reads as follows: "To maintain our low prices we are a non-authorized dealer of name brand designer jewelry."

Defendants may have presented sufficient evidence to defeat Plaintiff's motion for summary judgment as to the trademark infringement claim, which is based on allegations that Defendants misled consumers into believing that J. Kugel was an authorized dealer of Hidalgo jewelry.  We have previously explained, however, that Plaintiff also has significant evidence indicating that Defendants did in fact lead consumers to believe or at least improperly suggested to consumers that J. Kugel was an authorized dealer. Therefore, a genuine issue of fact exists that must be decided by the trier of fact at trial.

### 2.  *Count II - False Designation of Origin*

Defendants do not make any independent arguments in their motion as to this claim, thereby relying solely on the arguments already recited by the Court directly above. Given the evidence in this case, and noting the correlation between this claim and Plaintiff's claim for trademark infringement based on Defendants' false representations

that J. Kugel was an authorized dealer of Hidalgo jewelry, we find that this claim also presents genuine issues of material fact.  Viewing the evidence in the light most favorable to the non-movant, and as Judge Klein indeed found following a hearing on the injunction motion, there is sufficient evidence in the record that may allow Plaintiff to prove a likelihood of consumer confusion exists as to this claim.  This issue should be resolved by the trier of fact at trial.

### 3.  *Count III - Copyright Infringement*

Count III of the Amended Complaint alleges generically that Defendants' conduct also constitutes copyright infringement under the copyright act, 17 U.S.C. § 501.  The factual allegations that this Count is based on are entirely the same as the allegations raised in connection with the trademark infringement counts.  But those factual allegations only raise a copyright issue with respect to the resale of genuine Hidalgo jewelry that Defendants obtained from Casino.  Specifically, and without dispute here, Plaintiffs owned a copyright to one particular copyrighted ring, known as "the Hearts Ring."  The complaint alleges that Defendants' conduct infringed upon this copyright as they "intentionally, willfully and deliberately copies, distributed and exploited the Hidalgo copyrights without the express or implied permission of the Plaintiff."  [D.E. 19 ¶32]. Plaintiff has now abandoned the argument that Defendants were also selling "counterfeit" Hidalgo jewelry.

With this context in mind, to establish copyright infringement, Plaintiff must show that it owns a valid copyright and that Defendants copied original elements of the copyrighted material.  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  There is

23

no dispute that Plaintiff owns a valid copyright to the Hearts Ring.  The question is, however, whether there is a basis to claim that Defendants "copied" original elements of that copyrighted jewelry.

Defendants allege that they did not commit copyright infringement because the Hidalgo rings are genuine originals, and not copies in any sense.  Plaintiff concedes that the rings are genuine Hidalgos, but argues that distribution of the rings without their authorization also constitutes copyright infringement, citing *Hotaling v. Church of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997).  That case holds that distributing "unlawful copies" of a copyrighted work violates the copyright owner's distribution right and, therefore, constitutes copyright infringement.  But to establish "distribution" of a copyrighted work, a party must show that an unlawful copy was disseminated "to the public."  *Id.*  And that case clearly also points out that under the first sale doctrine that applies to copyright infringement actions, "the copyright owner's right to distribute a copyrighted work does not prevent *the owner of a lawful copy of the work from selling, renting, lending, or otherwise disposing of the lawful copy*."  *Id.* (emphasis added).

As the Court explained above, the copyright statutes have codified the first sale doctrine that is also recognized under the trademark statutes.  *See* 17 U.S.C. § 109(a).  Therefore, to establish a copyright claim outside the "broad scope" of this statute, *Quality King*, 523 U.S. at 152, Plaintiff must show that the copyrighted goods at issue here were in fact *not* "lawfully made under this title."  Plaintiff here simply fails to show how the Hidalgo rings that Defendants were reselling were "unlawful copies" of the copyrighted work.  In his Order, Judge Klein expressly found that Casino obtained the rings lawfully

24

from Plaintiff.  Casino purchased them in the stream of commerce from Hidalgo.  If the first sale from Hidalgo to Casino was lawful, then, absent any evidence to the contrary, the resale of the rings to Defendant was also lawful under the first sale doctrine, for the reasons already discussed above.  *See also United States v. Sachs*, 801 F.2d 839, 842 (3rd Cir. 1986) (defendant charged with infringing copyrighted works by distributing by sale copies of copyrighted motion pictures; court noted that implicit in the act of "infringement" is the requirement that the particular copy of the copyrighted work be an unauthorized or illegally obtained copy).

As the Defendants obtained the Hidalgo rings from Casino and Casino obtained the Hidalgo rings directly from the Plaintiff after the Plaintiff deemed it to be an "authorized dealer," Defendants simply cannot be found liable as a matter of law for copyright infringement on the basis of the distribution of genuine trademarked goods.  Plaintiff does not dispute that the essence of an unlawful copy requires a showing of actual copying, through direct or circumstantial evidence.  *E.g., Designer's View, Inc. v. Publix Super Markets, Inc.,* 764 F. Supp. 1473 (S.D. Fla. 1991), *aff'd,* 961 F.2d 223 (11th Cir. 1992). Plaintiff has in fact conceded to the contrary by stipulating that the Hidalgo jewelry was in fact "genuine."  Plaintiff has abandoned its contention that Defendants were selling "counterfeit" Hidalgo bands.  Summary judgment should thus be entered in favor of the Defendants as Plaintiff has failed to prove that Defendants were selling copies of Plaintiff's copyrighted works outside the scope of the first sale doctrine and 17 U.S.C. § 109(a).[3]

---

[3]     This is in contrast the conclusion reached above under the trademark infringement claims that also regulate the manner and means by which a reseller of goods markets the products.  The copyright statutes, on the other hand, are limited to the "copying" of copyrighted works; there was no "copying" here.

### 4. *Personal Liability of Individual Defendants*

Consistent with the Court's ruling on Plaintiff's motion with respect to the personal liability of Sabin and Kugel, the Court should deny Defendants' motion on the same issue for the reasons previously stated.  It is clear that the Sabin and Kugel may be held liable for trademark infringement; however, given that Defendant J. Kugel's liability has not yet been determined, it is impossible for the Court to determine Sabin and Kugel's liability at this juncture with respect to the trademark infringement claims.  Accordingly, Defendants' motion on the issue of Sabin and Kugel's liability should be denied.

### IV. *CONCLUSION*

It is hereby **RECOMMENDED** that Plaintiff's Verified Motion for Summary Judgment [D.E. 132] should be **DENIED**.  Defendants' Motion for Summary Judgment [D.E. 137] should be **GRANTED IN PART AND DENIED IN PART**.  Specifically, Defendants' motion should be granted with respect to Plaintiff's copyright infringement claim under 17 U.S.C. § 501.  Defendant's motion should otherwise be denied.[4]

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of October 2006.

_____
EDWIN G. TORRES
United States Magistrate Judge

cc:    Honorable Adalberto Jordan

---

[4]      Pursuant to Local Magistrate Rule 4(b), the parties have **ten (10)** days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Adalberto Jordan, United States District Judge.  Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.  *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger,* 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).