UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 05-20476-CIV-ALTONAGA

HIDALGO CORP.,

          Plaintiff,

vs.

J. KUGEL DESIGNS, INC.; JULIE
SABIN a/k/a JULIE KUGEL a/k/a JULIE
K. MOSKOWITZ; and ROBERT SABIN
a/k/a ROBERTO SABATINO,

          Defendants.

_____/

J. KUGEL DESIGNS, INC.,

          Counter-Plaintiff,

vs.

HIDALGO CORP., and SILVIO
HIDALGO, individually,

          Counter-Defendants.

_____/

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

      In this case, a suit over jewelry bearing the trademark "Hidalgo," Plaintiff alleges violations

by Defendants of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and the corporate Defendant

counter-sues Plaintiff and Plaintiff's principal for wrongful seizure and slander.  A bench trial

commenced April 2, 2007 and concluded on April 18, 2007.[1]  During and after the trial, the

undersigned reviewed the evidence admitted, and considered applicable law and arguments presented

---

[1] Trial was not held on all days in the intervening time period due to scheduling difficulties.

Case No. 05-20476-Civ-Altonaga

by counsel.   The following findings of fact and conclusions of law are therefore made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure.

## I.  <u>FINDINGS OF FACT</u>

*Background*

This case was transferred to the undersigned for trial.   Prior to trial, the magistrate judge entered a Report and Recommendation on Motions for Summary Judgment Relating to Trademark and Copyright Claims [D.E. 191], containing a detailed recitation of the undisputed facts, acknowledgment of a disputed factual issue, and a thorough analysis of the law governing the claims presented in the First Amended Complaint.   That Report and Recommendation was subsequently affirmed and adopted in an Order dated January 30, 2007 [D.E. 199], which similarly explained the remaining issues for trial on the two claims asserted by Plaintiff, Hidalgo Corp. ("Hidalgo), against Defendants, J. Kugel Designs, Inc. ("Kugel"), Robert Sabin ("Mr. Sabin") and Julie Kugel ("Ms. Kugel"): Count I for Trademark Infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114; and Count II for False Designation of Origin Pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a).   Also left for trial were two counts of the First Amended Counterclaim [D.E. 57] of Defendant/Counter-Plaintiff, Kugel: Count I for Wrongful Seizure as to Counter-Defendants, Silvio Hidalgo ("Mr. Hidalgo") and Hidalgo Corporation, under 15 U.S.C. § 1116(d)(11); and Count III[2] for Slander Per Se as to Mr. Hidalgo only.

Notwithstanding the extensive discussion of the facts contained in the magistrate judge's

---

[2] Summary judgment was granted [D.E. 197] as to Kugel's claim for conversion stated in Count II of the First Amended Counterclaim, following a Report and Recommendation of the magistrate judge [D.E. 192] recommending summary judgment on that claim.

Case No. 05-20476-Civ-Altonaga

Reports, as well as earlier findings in an Amended Report and Recommendation issued [D.E. 43] on Hidalgo's initial Motion for Preliminary Injunction, the parties were unable to submit a Joint Pretrial Stipulation setting forth a concise statement of material facts upon which they agreed. (*See Joint Pretrial Stip.* [D.E. 153]). The Joint Pretrial Stipulation did, however, contain a list of 17 numbered paragraphs of uncontested facts which required no proof at trial (although proof was sometimes offered), and which are summarized below as background for the additional findings made by the undersigned. (*See id.* at pp. 13-15).

***Uncontested Facts***

Hidalgo Corp. is a Florida corporation owned by Mr. Hidalgo. Hidalgo has a registered trademark with the United States Patent and Trademark Office, Reg. No. 1,976,800 (the "Mark"). The Hidalgo Mark has been used to identify and distinguish Hidalgo's enamel and diamond jewelry, particularly stackable rings, since 1984. Many of Hidalgo's original designs are copyrighted. The Hidalgo rings may be sold in sets or individually.

Hidalgo has spent in excess of $10,000,000 advertising its jewelry in magazines such as *Elle*, *Vogue*, *Architectural Digest*, *Town & Country*, and *Esquire*. (*See, e.g., Pl's. Comp. Tr.* Ex. 32). Hidalgo primarily sells its jewelry to a network of authorized Hidalgo representatives, with the exception of an occasional courtesy sale, as Mr. Hidalgo explained at trial. Some Hidalgo representatives are extended credit and others operate on a "cash only" basis. The names of some authorized representatives appear in the Hidalgo advertisements.

Kugel is a Florida corporation owned and operated by Defendants, Mr. Sabin and his wife, Ms. Kugel. Kugel has no fixed retail location; rather, it sells jewelry at jewelry shows, primarily

Case No. 05-20476-Civ-Altonaga

shows promoted by the International Gem and Jewelry Show.  The shows occur in various cities for periods of two to three days, and generally are located at convention centers.  Kugel sets up display booths, from which it shows and sells jewelry, or obtains orders and payment for jewelry that is subsequently delivered to its customers.

Casino Jewelers ("Casino") is a New Jersey corporation which is not a party to this litigation.  Mr. Sabin and Irv Schiller, Ms. Kugel's grandfather, each owned fifty percent (50%) of Casino.  Mr. Schiller died in February 2005.  In 2001, Casino became an authorized Hidalgo jewelry dealer.  In 2002, Casino sent correspondence to Hidalgo informing Hidalgo that its administrative offices were located at 61 Central Square, Suite 102, Linwood, New Jersey, 08821.  That address is a UPS facility in which Casino received mail.

Hidalgo never granted permission to Defendants to use the Hidalgo Mark.  The Hidalgo Mark has never been assigned or licensed to the Defendants.  In November 2002, Kugel placed a courtesy order with Hidalgo.

In September 2003, Hidalgo filed a lawsuit against Ms. Kugel in Miami-Dade County Circuit Court, seeking a declaratory judgment and an injunction under Fla. Stat. § 501.204.  The state lawsuit was eventually dismissed for lack of prosecution on December 22, 2005.

Mr. Sabin had communications with Hidalgo employees in his capacity as part-owner of Casino.  Whenever Mr. Sabin communicated with any Hidalgo representative or employee on behalf of Casino, he used the alias of "Richard Lewis."  Many of the checks submitted by Casino to Hidalgo as payment for Hidalgo goods show the name "Richard Lewis," although Mr. Sabin testified the

4

Case No. 05-20476-Civ-Altonaga

signature was not his, nor did he know who signed the name to the checks.[3]  At some point Casino closed a store it operated at the Sands Hotel and Casino in Atlantic City, New Jersey, but nevertheless continued to use letterhead bearing the name "Casino Jewelry at the Sands Hotel and Casino."

From 2001 to 2005, Kugel participated in many shows sponsored by the International Gem and Jewelry Show, and took custom orders for Hidalgo merchandise by ordering rings in particular sizes and colors which it did not have in stock at the time of the sales.  Kugel's display consisted of a plastic sign bearing the name "Hidalgo" within a glass enclosure containing jewelry[4] (*see also Pl's. Comp. Tr.* Ex. 5), a Hidalgo sales brochure (*see also Pl's. Tr.* Ex. 6) listing Hidalgo's products, and a hand-written sign with the words "entire line discounted 30-50%" or "30-50% discount from retail" (*see also Pl's.* Exs. 10, 12).

At the shows, Kugel received orders for Hidalgo jewelry from its customers, and would customarily require a fifty percent (50%) deposit.  Then, Kugel would submit purchase orders for Hidalgo merchandise to Casino.  Casino, in turn, would place orders for the requested pieces with Hidalgo.  After the pieces were manufactured, Hidalgo would send the merchandise to Casino in exchange for payment.  Casino would send Kugel the jewelry, and upon receipt of final payment from its customer, Kugel would forward the jewelry to the customer.

---

[3] The undisputed facts acknowledge that "[m]any checks submitted by Casino to Hidalgo for the payment of goods were signed by an unknown person other than Robert Sabin with the name "Richard Lewis." (*Joint Pretrial Stip.* at p. 15).

[4] The glass enclosure also contained other non-Hidalgo jewelry, and similar plastic signs identifying the other jewelry within the display.

5

Case No. 05-20476-Civ-Altonaga

Many Kugel customers purchased genuine Hidalgo inner enamel rings to wear alongside non-genuine Hidalgo diamond outer bands.[5]  Hidalgo does not require its authorized representatives or their customers to purchase Hidalgo diamond bands together with Hidalgo inner bands.  The Kugel invoices do not identify for the customer the manufacturer of the diamond bands.

The foregoing concludes the summary of the 17-numbered paragraphs of uncontested facts, with some additional observations and references to the evidence presented at trial.  And notwithstanding the issues as framed in the First Amended Complaint, the parties' Joint Pretrial Stipulation lists the following as the issues of fact which remained to be litigated at trial as to the main action: (1) whether Defendants infringed upon the Hidalgo trademark by inducing the public to believe they were endorsed by or associated with Hidalgo, in violation of Sections 32 and 43 of the Lanham Act; (2) whether Defendants infringed on Hidalgo's copyright of the "hearts" ring;[6] (3) whether Mr. Sabin and Ms. Kugel are personally liable for the acts of Kugel; (4) whether Defendants' sales of Hidalgo jewelry are protected by the first-sale doctrine; and (5) whether Defendants owe damages to Hidalgo, and if so, in what amount.  (*See Joint Pretrial Stip.* at p.16).

The following are additional facts which the undersigned finds material to resolution of the claims and defenses presented in the pleadings and identified by the parties as issues to be litigated at trial.

---

[5] This "stipulated fact," stated at paragraph 16 of the Joint Pretrial Stipulation, the undersigned assumes, was phrased incorrectly, and has been correctly restated in the text of this Order as the evidence and testimony, and the parties' arguments, bore out.

[6] The claim associated with copyright of the "hearts" ring of Ms. Lerman was abandoned at trial; indeed, there was no expert testimony at trial on the issue of whether or not the "hearts" ring was counterfeit.

Case No. 05-20476-Civ-Altonaga

***Additional Factual Findings***

Mr. Hidalgo started his company in 1984. (*See April 3, 2007 Tr. Trans.* at p. 27).   Hidalgo is primarily known for its collection of 18-karat gold stackable rings, that include enamel with gold rings and diamond bands that can be used interchangeably and mixed. (*See id.* at p. 28).  The Hidalgo name has several trademark registrations. (*See id.* at p. 30).

Kugel maintains two addresses, one is a UPS store location in which Kugel rents a box to receive correspondence and products, and the other is a UPS store from which Kugel sends out correspondence and products. (*See April 2, 2007 Tr. Trans.* at pp. 34-35). Ms. Kugel[7] placed an order for a special ring with Hidalgo sometime in 2001. (*See id.* at p. 36). After initial contact between Ms. Kugel and Hidalgo, Defendants knew that Hidalgo would not sell jewelry to them. (*See id.* at p. 44). Ms. Kugel was advised that Hidalgo would not sell to Kugel because Kugel sells at trade shows around the country, competing with Hidalgo's authorized representatives in various locations. (*See April 3, 2007 Tr. Trans* at p. 45). Indeed, the Hidalgo computer system contains a warning not to sell to Kugel. (*See id.* at p. 46).

Defendants therefore utilized Casino, an authorized Hidalgo jewelry dealer which is partially owned by Mr. Sabin, to purchase Hidalgo jewelry. (*See April 2, 2007 Tr. Trans.* at pp. 50, 79). Defendants' knowledge that Hidalgo would not approve of their sales of its product is reinforced by Mr. Sabin's continued use of the alias "Richard Lewis" in his dealings with Hidalgo. (*See id.* at p. 54).

In the fall of 2003, the state suit was filed against Ms. Kugel, and while Mr. Sabin received

_____

[7] Ms. Kugel did not testify or appear at trial, due to illness.

Case No. 05-20476-Civ-Altonaga

the complaint, he claims not to have read it or acquired an understanding of Hidalgo's claims against Ms. Kugel. (*See id.* at pp. 44-48). Rather, he claims that he merely turned the paperwork over to an attorney he obtained for his wife. An answer was filed on behalf of Ms. Kugel, presumably without any input by the Kugels. (*See Pl's. Tr.* Ex. 2). Needless to say, Mr. Sabin's testimony in this regard is not credible.

Mr. Sabin was shown Casino purchase orders, invoices, correspondence and checks, bearing the handwritten name of Richard Lewis, which he insisted did not bear his handwriting. (*See April 2, 2007 Tr. Trans.* at pp. 62-71, 132; *Pl's. Comp.* Exs. 3, 14 and 20). Although he was president[8] and fifty percent (50%) owner of Casino, he could not identify who, if not he, had signed the bogus name on the several documents shown.

Mr. Sabin and Irv Shiller made an arrangement that Mr. Sabin would not draw any income from Casino, rather, Casino would sell Kugel the Hidalgo jewelry at Casino's cost. (*See April 2, 2007 Tr. Trans.* at p. 77). Casino made no profit as a result of its sales to Kugel. (*See id.* at p. 120). Generally, the sequence of the transactions pertaining to Kugel's sales of Hidalgo jewelry was as follows:

> Q.    Would Kugel regularly accept orders for rings that it did not have in stock?
>
> A.    Yes.
>
> Q.    And in those circumstances it would have to obtain the rings

---

[8] Initially, Mr. Sabin did not know that he was president of Casino. During his trial testimony he had to be reminded that at his deposition he had testified he was president of Casino. At trial, he conceded, "Them I am, sir," in response to the question of whether he was president. (*April 2, 2007 Tr. Trans.* at p. 115, l. 15).

Case No. 05-20476-Civ-Altonaga

thereafter?

A.     Yes.

Q.     And this was a regular part of your practice?

A.     Yes.  We would send a requisition to Casino because they had stock on rings in different sizes.

         \*          \*         \*

If they didn't have it in stock then they would probably have to order it from Hidalgo.

(*Id.* at p. 81, ll. 1-17).  The first money that would exchange hands was from the Kugel customer to Kugel in the form of a deposit provided by the customer to Kugel at one of the jewelry shows (*see id.* at p. 85), and the balance would be collected from the customer once Kugel had received the jewelry from Casino.  (*See id.* at p. 121).

At the jewelry shows, Kugel would include in its showcases a color Hidalgo brochure, with prices marked.  Use of the Hidalgo product brochure was one of Kugel's sales tools.  (*See id.* at pp. 90-91).  Within the display case, in the section for the Hidalgo jewelry, would be a plastic "Hidalgo" sign, with font similar to the font utilized by Hidalgo for its product, and similar plastic signs bearing the same font were in other Kugel display cases for other makes of jewelry displayed there.  Also within the Hidalgo display case would be the Hidalgo "stackable" rings, with non-Hidalgo diamond bands shown among the Hidalgo rings.  The diamond bands were Nobel bands, a less expensive make, that, according to Mr. Sabin, the customers were verbally informed were not Hidalgo diamond

9

Case No. 05-20476-Civ-Altonaga

bands. (*See id.* at 97).[9]

After much prompting during his examination at trial, Mr. Sabin admitted that within the Kugel display case, Defendants placed a handwritten sign informing customers "30 to 50 percent off discount entire line." (*Id.* at p. 117, ll. 9-11; *Pl's.* Ex. 12). The sign was displayed to insinuate to Kugel customers that Kugel had the ability to obtain any ring in the Hidalgo line. (*See April 2, 2007 Tr. Trans.* at p. 118).

Defendants have a ten foot by four foot banner (*see Defs.' Tr.* Ex. 2), that is routinely placed above their booth at the jewelry shows. The banner contains the words: "to maintain our low prices we are a non-authorized dealer of brand name designer jewelry." (*Id.*).

On March 7, 2005 [D.E. 8], and pursuant to 15 U.S.C. § 1116(d)(9), Hidalgo obtained a court order authorizing it to seize counterfeit jewelry bearing the Hidalgo Mark from the Kugel display. At the time of the March 25, 2005 seizure of Kugel's Hidalgo products at the International Gem and Jewelry Show at King of Prussia, Pennsylvania, the 10 by 4 foot sign was not displayed because the worker who routinely puts it up had not had the time to do so before show opening. At all other shows, the sign is displayed.[10] The first day of trial, Mr. Sabin insisted that the 10 by 4 foot sign was up on display at the time of the seizure (*see April 2, 2007 Tr. Trans.* at p. 163),

---

[9] Mr. Sabin explained that only Hidalgo pieces went on a Hidalgo invoice, and the generic pieces, i.e., Nobel, would be reflected on a different invoice. (*See id.* at p. 101). At least one Kugel invoice, however, Plaintiff's Trial Exhibit 18, indicates otherwise.

[10] Curiously, the existence of this large sign, with the disclaimer, was never mentioned by Mr. Sabin at his deposition, nor was its existence alluded to at the hearing on the motion for preliminary injunction before the magistrate judge. (*See id.* at pp. 147-148). Mr. Sabin blames his former attorneys for failing to make reference to it at the hearing before the magistrate judge. (*See id.*).

Case No. 05-20476-Civ-Altonaga

notwithstanding several photographs taken that clearly showed its absence. Several days later, Defendants presented testimony by their installer acknowledging absence of the sign during the seizure, which took place on the first day of the King of Prussia jewelry show.

William Urban, a certified public accountant for 28 years, was hired by Plaintiff. From his examination of sales invoices, receivable ledgers, and purchase orders between the several parties (*see Pl's. Comp. Tr.* Ex. 20), as well as the Casino check register (*see Pl's. Comp. Tr.* Ex. 22) and other records, Mr. Urban determined that for a large portion of the sales recorded, Kugel took in special orders, there was a subsequent purchase order issued from Casino to Hidalgo, and then a corresponding and subsequent invoice from Hidalgo to Casino. (*See April 2, 2007 Tr. Trans.* at p. 197). In other words, "'[i]n all cases the date of the sale to the customer was the first date. Casino's purchase order to Hidalgo was the second date. Hidalgo's invoice to Casino was the third date." (*April 3, 2007 Tr. Trans.* at p. 21, ll. 10-12). Kugel's sales would occur prior to Kugel obtaining physical control of the merchandise (*see April 2, 2007 Tr. Trans.* at p. 197), because "these items are special orders that are being sold to the customer. The customer is paying for the merchandise before it's been manufactured." (*April 3, 2007 Tr. Trans.* at p. 25, ll. 5-7).

During the period of 2001 to 2005, the total amount of sales that Hidalgo made to Casino was $448,718. (*See id.* at p. 8). Approximately $45,000 has not been paid for. (*See id.*). From the records that Mr. Urban reviewed, Casino only made purchases from Hidalgo, and Casino only sold items to Kugel. (*See id.*). The Casino check register indicates no sales to any entity other than Kugel and no purchases from any entity other than Hidalgo. (*See id.* at p. 13). Mr. Urban calculated

11

Case No. 05-20476-Civ-Altonaga

Kugel's profit on its sales of Hidalgo jewelry as totaling $360,000, by subtracting the $448,000[11] from an approximate total selling price of $763,000.  (*See id.* at p. 10).

Certain events aroused Mr. Hidalgo's suspicions regarding Kugel's activities over a several-year time period.  At some time prior to this lawsuit, Mr. Hidalgo received rings from Corinne Lerman, who believed the rings she had purchased at a gem show were not genuine Hidalgo rings. (*See id.* at p. 29).  After a meeting with his staff, including a quality control specialist who has been with him for eight years, and the company enameler, Mr. Hidalgo was of the belief that the Lerman rings were not genuine Hidalgo rings.  (*See id.* at p. 34).

Also, at some point after Casino was approved as a Hidalgo representative based on representations that it had a retail facility at the Sands Hotel in Atlantic City, Mr. Hidalgo met with Mr. Sabin, who used the alias Richard Lewis and was in disguise, apparently wearing white make up, thick glasses, and a black wig.  (*See id.* at p. 50).

After learning that Kugel was selling the Hidalgo line, Mr. Hidalgo called the Kugel number several times, and was eventually told by Ms. Kugel that Kugel only sold some pieces of Hidalgo jewelry Kugel had purchased at Nordstrom.  (*See id.* at 51).  After hearing from more customers that Kugel was selling the Hidalgo product, in sizes that Nordstrom did not carry and at below wholesale cost, Mr. Hidalgo became convinced the Nordstrom tale was a lie.  He then hired an attorney and filed the state suit in 2003 against Ms. Kugel to get Kugel to stop selling the Hidalgo line.  (*See id.* at pp. 51-52).  Correspondence from one such customer, Stephanie Patterson, was attached to the state court complaint.  (*See Pl's. Tr.* Ex. 37).

---

[11] The outstanding $45,000 is not considered part of the cost.  (*See id.* at p. 10).

Case No. 05-20476-Civ-Altonaga

Of the Hidalgo sales to Casino, most of the jewelry consisted of custom orders,[12] and only two invoices were for the Hidalgo diamond bands, meaning that Kugel would primarily stock the Nobel diamond bands rather than the more expensive Hidalgo diamond bands. (*See id.*). Hidalgo received several calls from Kugel customers, an unusual occurrence given that Hidalgo is a wholesaler, not a retailer. (*See id.* at pp. 61-62). Prior to filing his affidavit in support of the order authorizing Hidalgo's seizure of counterfeit Hidalgo merchandise from Kugel at the King of Prussia show, Mr. Hidalgo spoke to Ms. Lerman, obtained her declaration, spoke to several of his employees knowledgeable about the Hidalgo product concerning the Lerman ring, and questioned Ms. Kugel regarding how Kugel had obtained Hidalgo merchandise, subsequently learning that the information she had provided concerning purchases from Nordstrom, was false. (*See id.* at pp. 80-82). From his conversation with Ms. Lerman, Mr. Hidalgo learned that Kugel was selling rings at below wholesale prices, a factor that also led him also to conclude that the rings being sold were counterfeit. (*See id.* at p. 84).

At some point in his investigation, Mr. Hidalgo also spoke to Arnold Duke, president of the International Gem and Jewelry Show, the organization that hosts the jewelry shows that Kugel attends. Mr. Hidalgo told Mr. Duke that he believed the three Lerman rings were not genuine Hidalgo rings. (*See id.* at p. 85).

Prior to the seizure of jewelry from the Kugel display at the King of Prussia show, Mr. Hidalgo did not know that Casino was supplying Kugel with the Hidalgo product, or that "Mr.

---

[12] The Hidalgo rings generally come in a size six-and-a-half. Anything other than that is manufactured as a custom order. (*See April 2, 2007 Tr. Trans.* at p. 59).

13

Case No. 05-20476-Civ-Altonaga

Lewis" of Casino and Mr. Sabin of Kugel were one and the same person. (*See id.* at p. 103). Prior to the seizure, Hidalgo had computer software with the capability of determining the authenticity of the Hidalgo products sold by Kugel, but Mr. Hidalgo was not aware that the software could provide that information. (*See id.* at p. 121).

Several rings were introduced in evidence, as matching the itemized list (*see Pl's. Tr.* Ex. 8) of rings seized by the U.S. Marshal from the Kugel display at the King of Prussia show. Mr. Hidalgo believes some to be genuine Hidalgo rings and some, perhaps three, not to be. (*See April 2, 2007 Tr. Trans.* at p. 96). As to the other rings, he cannot tell, nor did he ever order any scientific testing to assist in that determination, prior to or after the seizure. (*See id.*).

Turning to additional observations pertinent to Kugel's defenses and claims, Leeland Baughman, the show manager for International Gem and Jewelry, testified that the King of Prussia show had been open for approximately one hour when agents of the U.S. Marshal Service, a lawyer for Hidalgo, and a representative of the King of Prussia establishment, David De Marzio, appeared at the Kugel booth to execute the court order of seizure. (*See April 16, 2007 Tr. Trans.* at p. 6). Execution of the court order and seizure of the Hidalgo jewelry took place while customers were around the area. (*See id.* at p. 7). Mr. Baughman, at some point in the past, had barred Ms. Lerman from attending the International Gem Shows because she had exchanged sticker prices on jewelry without authorization, but subsequently she was allowed to return to the shows at the order of Mr. Duke, one of the owners. (*See id.* at p. 11).

Arnold Duke, of the International Gem and Jewelry Show, controls selection of the individuals who display and sell jewelry at the shows. (*See id.* at p. 19). His organization screens all of the

14

Case No. 05-20476-Civ-Altonaga

exhibitors and, according to Mr. Duke, stands behind every transaction that takes place at the shows. (*See id.*).  Sometime in early October 2004, after a conversation with Ms. Lerman, Mr. Duke had a conversation with Mr. Hidalgo, during which he told Mr. Hidalgo he believed the rings sold at his show were genuine Hidalgo rings.  (*See id.* at p. 22).  Mr. Duke has generally seen the Kugel banner, Defendant's Trial Exhibit 2, displayed at his shows.  (*See id.* at pp. 27-28).  Since the March 5, 2005 seizure, Mr. Duke has received inquiries from customers and exhibiting companies concerning whether Kugel sells counterfeit merchandise.  (*See id.* at p. 29).

For approximately four years, Jeff Wikel has set up booths for Kugel, and has also placed the Kugel banner, Defendant's Trial Exhibit 2, above the Kugel booth.  (*See id.* at pp. 42-43).  The banner was not up when the seizure took place because Mr. Wikel had not gotten around to putting it up.  (*See id.* at p. 44).

Michael Anthony De Carlo, a certified public accountant, estimates the profits lost by Kugel as a result of the negative effects of the March 5, 2005 seizure to be the sum of approximately $236,000.  (*See April 17, 2007 Tr. Trans.* at p. 18).  Plaintiff's Exhibits 16, 17, and 18, invoices of Kugel sales of Hidalgo jewelry, state:

> You are buying wholesale and all sales are final.  No returns will be accepted without a return authorization number.  All custom or special order items are non-cancellable and are subject to delays in manufacturing or import, fire, theft, lockout, or acts of God beyond our control.  JKD agrees to manufacture/import subject to these terms and customer agrees to accept these terms.

(*See id.* at pp. 48-49).  According to Mr. De Carlo, however, the sales did not occur until merchandise was delivered to the customer.  (*See id.* at p. 49).

15

Case No. 05-20476-Civ-Altonaga

## II. <u>CONCLUSIONS OF LAW</u>

**A.    <u>Hidalgo's Claims Against Kugel and the Sabins</u>**

*1.    Nature of Hidalgo's Claims*

In Count I of the First Amended Complaint, Hidalgo alleges trademark infringement in

violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.  Section 32 provides in pertinent part:

> Any person who shall, without the consent of the registrant . . . use in commerce any
> reproduction, counterfeit, copy, or colorable imitation of a registered mark in
> connection with the sale, offering for sale, distribution, or advertising of any goods
> or services on or in connection with which such use is likely to cause confusion, or
> to cause mistakes, or to deceive . . . shall be liable in a civil action by the registrant.
> . . .

15 U.S.C. § 1114(1).  The claim in Count I is that Defendants' "promotion, advertisement and

commercial sale of both genuine Hidalgo and non-Hidalgo jewelry using the Hidalgo Mark," (*First*

*Am. Compl.* [D.E. 19] ¶ 39), as well as Defendants' promotion, advertisement and sale of "imitation

Hidalgo jewelry and non-Hidalgo outer bands, which Defendants market as a genuine Hidalgo set of

stackable rings" (*id.* ¶ 40), infringe the Hidalgo mark in violation of Section 32.  Defendants'

"infringing activities are likely to cause and actually are causing confusion, mistake and deception

among members of the consuming public as to the origin and quality of the jewelry sold, . . . as well

as to confuse the public to believe that Defendants are authorized Hidalgo representatives." (*Id.* ¶

42).

In Count II, Hidalgo alleges unfair competition in violation of Section 43(a) of the Lanham

Act, which provides in pertinent part as follows:

> Any person who, on or in connection with any goods or services, or any container for
> goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading description

16

Case No. 05-20476-Civ-Altonaga

of fact, or false or misleading representation of fact, which . . . is likely to cause
confusion, or to cause mistake, or to deceive as to the affiliation, connection, or
association of such person with another person, or as to the origin, sponsorship, or
approval of his or her goods, services, or commercial activities by another person .
. . shall be liable in a civil action by any person who believes that he or she is or is
likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  Hidalgo maintains that Defendants' actions in using the Hidalgo Mark to

market three stackable rings as genuine Hidalgo sets is likely to cause confusion to the general public

as to the origin of the jewelry and the authority of the Defendants to act as authorized Hidalgo

representatives.  (*See First Am. Compl.* ¶ 45).

The issues of law which remain for determination by the Court on the main action, according

to the parties' Pretrial Stipulation, are: (1) whether the Defendants have infringed the Hidalgo

trademark by using the mark "Hidalgo" in commerce by holding themselves out as associated with

or endorsed by Hidalgo; (2) whether the Defendants infringed upon Plaintiff's copyright of the

"hearts" ring;[13] (3) whether Mr. Sabin and Ms. Kugel are personally liable for the infringing acts of

Kugel; and (4) whether Defendants are entitled to the protection of the "first-sale doctrine."  (*See*

*Pretrial Stip.* at p. 25).

2.      *The Law Governing Hidalgo's Claims: Trademark Infringement Law*

In enacting trademark legislation, Congress sought to protect consumers and registered

trademark owners.  *See Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir.

2001).  The Lanham Act protects consumers by excluding others from using a mark and making

consumers confident that they can purchase brands without confusion.  *Id.* (citation omitted).  The

---

[13] Again, the copyright claim involving the "hearts" ring was abandoned.

17

Case No. 05-20476-Civ-Altonaga

Lanham Act protects trademark owners because it prevents other vendors from acquiring a product that has a different set of characteristics and passing it off as the product of the trademark owner. *Id.* (citations omitted). The Hidalgo Mark is valid and entitled to protection under the Lanham Act. *See Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir. 1993).

"[T]rademark infringement occurs when a defendant uses the plaintiff's trademark in a manner that suggests that the defendant is affiliated with the plaintiff's company even though the defendant deals in the goods of the trademark owner." *Stormor, a Div. of Fuqua Indus., Inc. v. Johnson*, 587 F. Supp. 275, 278 (D. Mich. 1984) (citation omitted). Not every use of a trademark without the trademark owner's consent, however, amounts to trademark infringement. *Id.* at 278-79.

To prevail on a trademark infringement claim under 15 U.S.C. § 1114, a plaintiff "must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake, or to deceive." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir. 1983) (citing 15 U.S.C. § 1114(1)(a)). "[T]he determination boils down to the existence *vel non* of 'likelihood of confusion.'" *Davidoff*, 263 F.3d at 1301 (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986)). "As with trademark infringement, the touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion.'" *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 592 (5th Cir. 1993). Thus, while Section 32 prohibits trademark infringement and Section 43(a)(1) prohibits unfair competition, both statutory proscriptions center upon practices likely to cause confusion, deception or mistake on the part of the consumer, and consequently, damage to the trademark owner.

18

Case No. 05-20476-Civ-Altonaga

The two primary issues raised in regard to Hidalgo's claims against Defendants, and the defenses asserted, are: 1) whether Defendants are only engaged in the resale of genuine goods, and may avail themselves of the first-sale or exhaustion doctrine under trademark law to foreclose Plaintiff from relief; and 2) whether Defendants' actions created a likelihood of confusion, or resulted in actual confusion, as to the source, affiliation, connection or sponsorship of the goods in question. These issues are addressed in turn.

i.   Sale of Genuine Goods: Exhaustion Doctrine

In a Report and Recommendation issued prior to trial, the magistrate judge explained the first-sale doctrine as follows:

> The first sale doctrine protects resellers of genuine trademarked goods from claims of infringement. *Davidoff & CIE, S.A. v. PLD Int'l. Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001). This doctrine is premised on the theory that consumers are not confused as to the origin of goods that are resold. *Id.* The Lanham Act only seeks to "prevent the deceptive use of trademarks to confuse consumers, thereby protecting consumer goodwill toward the trademark owner's business and the ability of consumers to make informed choices among competing products." *McDonald's Corp. v. Shop At Home, Inc.*, 82 F.Supp.2d 801, 807 (M.D. Tenn. 2000). Under the first sale doctrine, the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of the product. *Davidoff & CIE, S.A.*, 263 F.3d at 1301.

(*Report and Recomm.* [D.E. 191] at p. 9).

The exhaustion or "first-sale" rule "preserves an area for competition by limiting the producer's power to control the resale of its product." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1075 (9th Cir. 1995). "When a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute." *Id.* at 1076. The Order affirming the Report and Recommendation, entered before trial,

19

Case No. 05-20476-Civ-Altonaga

defined that the outstanding issue of fact, preventing the grant of summary judgment on the defense of the first-sale doctrine was whether Defendants engaged in "something more" than merely stocking and reselling the Hidalgo product. (*Order on Report and Recomm.* [D.E. 199] at p. 7). Based on the testimony and evidence presented, the undersigned concludes that Defendants did engage in something more than merely stocking and reselling the Hidalgo jewelry, and thus, they find no protection from the charges of trademark infringement under the exhaustion or first-sale doctrine. *See, e.g., D 56, Inc. v. Berry's Inc.*, 955 F. Supp. 908, 919-920 (N.D. Ill. 1997) (defendants' use of plaintiff's trademark and promotional materials in advertising and displays, distribution of plaintiff's trademarked pamphlets and posters as promotional tools, and display of signs bearing plaintiff's trademark in defendants' store precluded defendants' reliance on the exhaustion doctrine); *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 916 (Fed. Cir. 1984) (no protection where seller used producer's trademark in a telephone directory advertisement in a way to suggest reseller was a franchisee of the producer); *Stormor*, 587 F. Supp. at 280 (reseller lost protections of first-sale doctrine where it displayed producer's trademark in reseller's booth at trade show and in advertisement, and stamped reseller's name on producer's promotional literature and used it in advertising).

As an initial matter, the undersigned is persuaded by Plaintiff's argument, presented for the first time at trial, that the sales by Defendants to their customers at the jewelry shows, were in actuality the "first sale" of Hidalgo jewelry, not an act of stocking and reselling, which is necessary for the exhaustion doctrine protections to apply. Defendants engaged in the first sale of Hidalgo jewelry by taking orders from customers for jewelry that Defendants did not at the time actually have

20

Case No. 05-20476-Civ-Altonaga

in stock.  The orders were accompanied by an exchange in money and invoices that explained the sales were final and non-cancellable.

What followed in generally all instances was that Defendants would then request the items selected by their customers from Casino, their "secret" supplier and authorized Hidalgo representative.  Casino would place the order with Hidalgo, receive the merchandise that had already been "sold" at the trade shows, and then send it to Defendants, one of whom, Mr. Sabin, was also president and technically in control of Casino, Irv Schiller and Mr. Sabin's professed ignorance of documents bearing his signature notwithstanding.  Defendants would then ship the jewelry to the customers, who had already purchased the items, using a post office address Defendants utilize for shipping merchandise.  The sequence of events is clearly not what is contemplated by a stock and resale situation.

Second, even if the first completed sale should be considered to be the transaction between Hidalgo and Casino, as Defendants maintain it is, and their expert opines existed, Defendants are also not entitled to protection and the first-sale defense because they engaged in advertising the Hidalgo product, the "something more" the Order on Report and Recommendation had left for the fact-finder to determine after a trial.  Defendants engaged in advertising the Hidalgo product by using the Hidalgo product brochure, prominently placed within or on a glass display containing nothing but Hidalgo jewelry and the less expensive, non-Hidalgo diamond bands located within the display. Defendants placed a sign within the glass display announcing to customers that they offered between 30 to 50% off the entire Hidalgo line.  Defendants created plastic signs that they placed within the glass display, showing the Hidalgo name with font style identical to the font style Hidalgo normally

21

Case No. 05-20476-Civ-Altonaga

uses.[14]

Such advertising of the Hidalgo product places Defendants outside the protections afforded by mere stock and resale.  The undersigned thus turns now to a consideration of whether Plaintiff has met its burden of proving the charges of trademark infringement stated in Counts I and II.

## ii.  Likelihood of Confusion or Actual Confusion

The Order on Report and Recommendation, denying summary judgment on Counts I and II, identified several critical issues of fact remaining for trial.  One issue was whether the presence of the large sign which contained the words, "to maintain our low prices we are a non-authorized dealer of brand name designer jewelry," was sufficient to dispel any likelihood of confusion arising from Defendants' unauthorized sales of Hidalgo jewelry.  (*See* [D.E. 199] at p. 5).  Another issue that precluded the grant of summary judgment was whether Defendants misled their customers through the unauthorized sales of Hidalgo jewelry.  (*See id.*).  Another issue was whether consumers were likely to be confused by Defendants' display of non-genuine rings in a Hidalgo display box, and believed the cheaper diamond bands they were purchasing were genuine Hidalgo rings.  (*See id.* at 5-6).

"'The 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods . . . among the relevant class of customers and potential customers.'"  *D 56, Inc.*, 955 F. Supp. at 920 (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992)).   The Eleventh Circuit has recognized seven

---

[14] Defendants used plastic signs advertising or identifying their other jewelry products, bearing other manufacturers' names, that also contained the same font and style.

Case No. 05-20476-Civ-Altonaga

factors as relevant to the determination of "likelihood of confusion" between two trade marks:

> (1) the type of mark at issue, (2) the similarity of design between the two marks, (3) the similarity of product, (4) the identity of retail outlets and purchasers, (5) the identity of advertising media utilized, (6) the defendant's intent, and (7) actual confusion between the two marks.

*Univ. of Georgia Athletic Assoc. v. Laite*, 756 F.2d 1535, 1542 (11th Cir. 1985) (citations omitted);

*see also Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1164 (11th Cir. 1982)

(citations omitted).

While not all of the factors are relevant here, given that the issue is not confusion between two marks, as it was in *Univ. of Georgia Athletic Assoc.*, some of them are certainly useful and necessary to analyze here. The undersigned addresses the factors in a different order from the foregoing list, considering first the issue of Defendants' intent. Defendants clearly intended to deceive Hidalgo by obtaining the Hidalgo product through subterfuge and lies. Mr. Sabin repeatedly lied during his testimony in court, about such matters as his ignorance of the initial suit filed by Hidalgo against Julie Kugel, and then about his "ignorance" concerning the transactions of Casino and Casino records showing his signature. He lied during the events in question, by using an alias, using a disguise, and setting up Casino as a front and authorized Hidalgo representative for the sole purpose of channeling Hidalgo products to Kugel, a jewelry "retailer" Hidalgo had not wanted to have as an authorized representative. Ms. Kugel also lied to Hidalgo in misrepresenting that Kugel had acquired the jewelry from Nordstrom.

Defendants' intentions to deceive Hidalgo, however, are not the issue. The issues is whether they intended to deceive their customers into believing that (1) they were an authorized Hidalgo representative, and (2) that certain cheap diamond bands were Hidalgo rings.

23

Case No. 05-20476-Civ-Altonaga

As to the first, the answer is "no." The use of a prominent sign, clearly advising customers in attendance at traveling jewelry shows that Defendants "are a non-authorized dealer of brand name designer jewelry" in order to be able to maintain low prices, clearly conveyed the message that Defendants were not an authorized Hidalgo dealer. *See, e.g., Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987) ("Although we have found disclaimers to be adequate in certain cases, each case must be judged by considering the circumstances of the relevant business and its consumers."). The existence of a Hidalgo brochure, a sign with the Hidalgo name in the same font Hidalgo uses, along with other signs bearing the same font and style to advertise the other jewelry carried by Defendants, and a sign stating Defendants charged 30 to 50% less on the entire line of Hidalgo jewelry were not likely to cause confusion to customers, given the existence of the prominent sign. While the undersigned may wonder why the existence of the sign was not raised earlier by Defendants at other pre-trial hearings, that speculation cannot support a finding that the sign was not indeed utilized, particularly given Defendants' witnesses' testimony that it was so displayed.

As to the second issue, whether consumers were deceived into believing that the less expensive diamond bands sold along with genuine Hidalgo jewelry were really Hidalgo diamond bands, Mr. Sabin testified that consumers were told the cheaper diamond bands were non-Hidalgo bands. While the testimony is hardly credible, given the general lack of trustworthiness of Mr. Sabin, no evidence was presented that any consumer was in fact so deceived or confused in his or her purchase of the non-Hidalgo diamond bands. Indeed, in his closing argument to the Court, counsel for Hidalgo conceded as much: "There has been no evidence that has occurred [consumers believing

24

Case No. 05-20476-Civ-Altonaga

the diamond bands were genuine] but that is a deception to the customers." *(April 18, 2007 Trial Trans.* at p. 19, ll. 23-25). Because Plaintiff carried the burden of showing confusion, with the sparse evidence presented on this score, the undersigned finds that Plaintiff has not sustained its burden of proof.

Where the principal issue at trial was consumer confusion, surprisingly there was minimal to little evidence of actual confusion or a likelihood of confusion. No consumers testified that they were confused, and the representatives of the International Gem and Jewelry Show testified that they never received any inquiries from consumers expressing any confusion. While Ms. Lerman and Ms. Patterson had complaints about products purchased from Defendants, the undersigned has had no opportunity to judge those ladies' credibility, and certainly Ms. Lerman's ethics were called into question as a result of her past actions at the International Gem and Jewelry Show.

As to the identity of retail outlets and purchasers, it appears that Defendants' traveling jewelry show is materially different from the more reputable establishments that Hidalgo has approved as its authorized representatives. Hidalgo made much of emphasizing the differences between the quality of its authorized representatives and the nature of the Defendants' operation. No evidence was presented contrasting the purchasers who attend the jewelry shows versus those who buy their jewelry from fixed retail establishments, and so the undersigned is not able to complete her evaluation of this factor.

Plaintiff did introduce examples of its advertising media, consisting of high quality publications. No examples of Defendants' advertising media, if any exist, were presented, other than the evidence of the on-site advertising adjacent to the displays of Hidalgo jewelry. Thus, the

25

Case No. 05-20476-Civ-Altonaga

undersigned is not able to fully evaluate the factor of the advertising media used, another factor suggested in the multi-factor analysis. As to the type of mark at issue, the similarity of design between the two marks, and the similarity of product, these are not factors that appear in the present case, given that the claim is that Defendants' unauthorized use of the Hidalgo Mark caused confusion or deception, not that Defendants sold goods bearing a similar mark.

After conducting the foregoing multi-factor analysis, and upon a careful consideration of the testimony and evidence presented, the undersigned is not persuaded that Plaintiff has shown that the challenged activities of Defendants caused confusion or a likelihood of confusion in consumers that Defendants were authorized Hidalgo representatives, or that Nobel diamond bands were sold as Hidalgo bands. A mere possibility of such confusion is all that has been shown, not a likelihood of confusion. Accordingly, and notwithstanding the failure of their affirmative defense of the exhaustion or first-sale doctrine, Defendants prevail on Plaintiff's claims of a violation of the Lanham Act, as stated in Counts I and II.

**B.   Kugel's Claims Against Hidalgo and Mr. Hidalgo**

*1.    Nature of Kugel's Claims*

Count I of the First Amended Counterclaim, for Wrongful Seizure, alleges a violation by Hidalgo and Mr. Hidalgo of 15 U.S.C. § 1116(d)(11). That section provides in pertinent part:

> [a] person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to recover such relief as may be appropriate, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith, and, unless the court finds extenuating circumstances, to recover a reasonable attorney's fee.

Kugel maintains the Counter-Defendants engaged in a wrongful seizure because they misrepresented

26

Case No. 05-20476-Civ-Altonaga

that Kugel had counterfeit Hidalgo jewelry, sought an order allowing them to seize counterfeit Hidalgo jewelry, and then utilized the order obtained to seize genuine Hidalgo jewelry.

Count III, for Slander Per Se, alleges only a violation by Mr. Hidalgo. It is alleged that Mr. Hidalgo made several false statements about Kugel in his written declaration, and communicated disparaging and untrue statements to others, including Kugel's business associates, competitors, customers and potential customers.

         2.    *The Law as Applied to Kugel's Claims*

         i. <u>Wrongful Seizure</u>

In order to prevail on its claim of a wrongful seizure, Kugel has to show that (1) the applicant for the seizure order acted in "bad faith" in seeking the order, *or* (2) that the goods seized are predominantly legitimate merchandise, even if the plaintiff acted in good faith. *See Waco Int'l v. KHK Scaffolding*, 278 F.3d 523, 531 (5th Cir. 2002). While what constitutes a wrongful seizure is left to the courts to determine on a case-by-case basis, and is not defined in the statute, the legislative history offers some guidance. First, "the mere fact that a few legitimate items may have been seized does not make the seizure as a whole wrongful." *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1048 (D.N.J. 1990) (citing Joint Statement on Trademark Counterfeiting Legislation, Senate Comm. on the Judiciary, S. Rep. No. 98-526, 98th Cong. 2d Sess. 34-628, 629). Second, "a seizure will be wrongful if the applicant acted in bad faith in seeking it. For example, it would obviously constitute bad faith for an applicant to seek a seizure order in an effort to prevent the sale of legitimate merchandise at discount prices." *Id.* Third, "a seizure must be considered 'wrongful' if the matter seized is legitimate, noninfringing merchandise." *Id.*

Case No. 05-20476-Civ-Altonaga

Here, Hidalgo had sought to stop what it believed was infringing activity by first filing a state court suit against Ms. Kugel. Defendants resisted service, and did not thereafter cease their activities. Before obtaining the order in question, Mr. Hidalgo spoke to his staff and attempted to discover if the ring Defendants had sold to Ms. Lerman was counterfeit, and it appeared to his staff that it was counterfeit. Mr. Hidalgo discovered that several of the rings sold to Ms. Lerman were sold at below the wholesale price, thus also indicating they might be counterfeit.

Mr. Hidalgo confronted Ms. Kugel about the source of the goods sold, and she lied to him, stating that they had been purchased at Nordstrom. Two of Defendants' customers had written to Hidalgo, complaining that Defendants were selling counterfeit goods. Mr. Hidalgo called and spoke to representatives of the International Gem and Jewelry Show, inquiring about the genuineness of the product, and was told it was not counterfeit. The magistrate judge determined that Defendants had offered for sale some counterfeit rings. Hidalgo hired counsel, and relied on counsel to file the necessary supporting documents and lawfully execute the order with the assistance of the U.S. Marshal. Of the rings seized, Mr. Hidalgo believes some to be counterfeit.

On this record, and while Hidalgo could have done more in its investigation prior to seeking the court order,[15] the undersigned is not persuaded that Counter-Plaintiff, Kugel, has met its burden of showing that a wrongful seizure occurred, notwithstanding that most of the rings seized were genuine Hidalgo rings. Moreover, Kugel cannot be rewarded for its subterfuge and lies. Had Kugel properly informed Hidalgo of the deception practiced by Defendants to obtain the Hidalgo product,

---

[15] The undersigned is also not convinced by Counter-Plaintiff's argument that bad faith is shown on the basis that Hidalgo could have searched its computer records to confirm the authenticity of the jewelry, as Mr. Hidalgo testified that he was unaware he had systems in place that could be so utilized.

Case No. 05-20476-Civ-Altonaga

i.e., that the rings were purchased from Casino, an authorized Hidalgo dealer, and Hidalgo then

sought the *ex-parte* order, a proper claim would be stated.  As it is, Kugel comes before the Court

with unclean hands in asserting the claim for wrongful seizure.

ii.   Slander Per Se

Counter-Plaintiff framed its claim in Count III for Slander as follows:

> The gravamen of J. Kugel's defamation claim is that (1) Silvio Hidalgo told one of the owners of an International Gem & Jewelry Show that he believed J. Kugel Designs was selling counterfeit Hidalgo jewelry; (2) that Mr. Hidalgo told one of J. Kugel's customers that the rings she purchased from J. Kugel were counterfeit; and (3) that the loud manner in which Mr. Hidalgo executed the search warrant at the . . . show informed customers and vendors of the false allegations concerning J. Kugel's jewelry.  That these actions, at a trade show, were calculated to cause news of J. Kugel's alleged sale of counterfeit goods, to spread quickly throughout the business community in which the Defendants operate.

(*Defendants/Counter-Plaintiff's Prop. Findings of Fact and Conc. of Law* [D.E. 213] at pp. 8-9).

"Slander is a spoken or oral defamation of another which is published to others and which

tends to damage that person's reputation, ability to conduct that person's business or profession, and

which holds that person up to disgrace and humiliation."  *Scott v. Busch*, 907 So.2d 662, 666 (Fla.

5th DCA 2005) (citations omitted).  Florida recognizes qualified privileges to a claim for slander.

"'A communication made in good faith on any subject matter by one having an interest therein, or in

reference to which he has a duty, is privileged if made to a person having a corresponding interest or

duty, even though it contains matter which would otherwise be actionable, and though the duty is not

a legal one but only a moral or social obligation.'"  *American Ideal Mgm't, Inc. v. Dale Village, Inc.*,

567 So.2d 497, 499 (Fla. 4th DCA 1990) (quoting *Nodar v. Galbreath*, 462 So.2d 803, 809 (Fla.

1984), quoting 19 Fla. Jur. 2d *Defamation and Privacy* § 58 (1980)).  To avail oneself of a qualified

29

Case No. 05-20476-Civ-Altonaga

privilege, the statement must have been made in good faith, that is, with good motive and not for the purpose of harming the subject of the defamation. *Lewis v. Evans*, 406 So.2d 489, 492 (Fla. 2d DCA 1981).

Turning to the first two purported defamatory statements, Mr. Hidalgo's conversation with the owner of International Gem and Jewelry and conversation with a Kugel customer, the undersigned is not persuaded that Mr. Hidalgo made the statements with bad faith and for the purpose of harming Hidalgo. His statements were prompted by information he had been receiving regarding what appeared to be the sale of counterfeit Hidalgo product by Kugel, and he certainly had a duty to report that information to the owner of the Show and a Kugel customer who was complaining of the Hidalgo product.

As to the last claimed slanderous statement, the statements made at the King of Prussia jewelry show, there has been no showing that Mr. Hidalgo directed his counsel on what to say, how to act, or when to effectuate the seizure. Although counsel was certainly Mr. Hidalgo's agent, no evidence was presented that Mr. Hidalgo directed his attorney to make the statements or engage in the acts complained of, so as to be held accountable for those.

For all of the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1.     On the main action, final judgment will be entered by separate order in favor of Defendants in accordance with Fed. R. Civ. P. 58. On the counterclaim, final judgment will be entered by separate order in favor of Counter-Defendants in accordance with Fed. R. Civ. P. 58.

30

Case No. 05-20476-Civ-Altonaga

2.      Any of the foregoing conclusions of law which may represent findings of fact are

adopted as findings of fact.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of May, 2007.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

31